Raymond Levi COBB, Appellant,

v.

The STATE of Texas.

No. 72,807.

Court of Criminal Appeals of Texas,
En Banc.

March 15, 2000.

Certiorari Granted June 26, 2000.

See 120 S.Ct. 2716.

Roy Greenwood, Austin, for appellant.

David P. Weeks, DA, Kay Douglas, Asst. DA, Huntsvlle, Matthew Paul, State's Atty., Austin, for the State.

## *O P I N I O N*

MANSFIELD, J., delivered the opinion of the Court, in which MEYERS, PRICE, HOLLAND, WOMACK, and JOHNSON, JJ., joined.

Appellant, Raymond Levi Cobb, was found guilty of intentionally killing two people in a single criminal transaction. See Tex. Pen.Code § 19.03. His punishment was assessed at death. In eleven points of error, he argues that he is entitled to a new trial or at least a reformation of his sentence from death to imprisonment for life. We will reverse the judgment of the trial court and remand the cause for a new trial.

We turn first to appellant's eleventh point of error, in which he contends that the evidence adduced at trial was legally insufficient to support the jury's affirmative answer to the first punishment issue, concerning his future dangerousness. See Art. 37.071, § 2(b)(1).[1] Appellant argues that the evidence was insufficient because (1) he was only seventeen years old at the time of the offense, (2) he had no prior history of violent conduct, (3) he had no prior convictions, (4) the testimony of prosecution witness Dr. Frederick Mears, a licensed clinical psychologist, was "inherently unreliable" and thus inadmissible because he did not actually examine appellant, and (5) defense witness Dr. Walter Quijano, also a licensed clinical psychologist, testified that appellant would not likely be a future danger if imprisoned for life.

Under the first punishment issue, the jury was asked to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1). The State had the burden of proving the first punishment issue beyond a reasonable doubt. Art. 37.071, § 2(c). Thus, the State had the burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence, so as to constitute a continuing threat, whether in or out of prison. *Narvaiz v. State*, 840 S.W.2d 415, 424 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). In its determination of this issue, the jury was entitled to consider all of the evidence presented at both the guilt/innocence and punishment stages of trial. *Valdez v. State*, 776 S.W.2d 162, 166–167 (Tex.Crim.App.1989), *cert. denied*, 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). As an appellate court reviewing the jury's finding, we view all of the

1. All references to articles are to those in the Texas Code of Criminal Procedure.

record evidence, whether properly or improperly admitted, in the light most favorable to the prosecution, and then determine whether, based on that evidence, any rational jury could have found beyond a reasonable doubt that the answer to the first punishment issue was "yes." *Miles v. State,* 918 S.W.2d 511, 512 (Tex.Crim.App. 1996); *Harris v. State,* 738 S.W.2d 207, 225–226 (Tex.Crim.App.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). This standard of review gives full play to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence. See *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). If we find that the evidence was legally insufficient to support the jury's affirmative answer, then we must reform the trial court's judgment to reflect a sentence of life imprisonment. Art. 44.251(a).

Viewed in the necessary light, the evidence at the guilt/innocence stage established that sometime between 5:45 a.m. and 5:15 p.m., December 27, 1993, appellant burglarized the Lindsey and Margaret Owings residence in a rural part of Walker County and stole a stereo system, a video-cassette recorder, and other items. In the course of the burglary, appellant intentionally killed 22–year–old Margaret Owings and sixteen-month-old Kori Rae Owings. The evidence at the punishment stage, viewed in the necessary light, established that appellant has a dangerous personality disorder and lacks any regard for the welfare of others. We hold that, based on the totality of the evidence presented at trial, a rational jury could have found beyond a reasonable doubt that appellant is dangerous and incorrigible and that the answer to the first punishment issue is "yes." The jury was not required to give controlling weight to appellant's youth or lack of a violent past or criminal record. Nor was the jury required to give controlling weight to Dr. Mears' failure to examine appellant personally. We overrule appellant's eleventh point of error.

■ We turn next to appellant's fourth point of error, in which he contends that the trial court erred in admitting in evidence, at the guilt/innocence stage, a written statement he gave to police shortly after his arrest. Appellant, citing *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), and *Upton v. State,* 853 S.W.2d 548 (Tex.Crim.App. 1993), argues that the police obtained the statement in violation of his Sixth Amendment right to counsel because the police initiated interrogation of him without first notifying his counsel of record. The State argues in response that, at the time the police interrogated appellant, his Sixth Amendment right to counsel had not yet attached. The State argues in the alternative that even if the right had attached, the right had been waived because on two previous occasions defense counsel had allowed police to interrogate appellant without counsel being present.

The facts relevant to this point of error are as follows: On December 27, 1993, Lindsey Owings notified the Walker County Sheriff's Office that his home had been burglarized and that some of his property had been stolen. He also reported that his wife, Margaret, and his daughter, Kori Rae, were missing.

Sometime in early February 1994, the sheriff's office received an anonymous tip that appellant, who resided across the street from the Owings residence, might have been involved in the burglary. Walker County investigators questioned appellant about the burglary and the disappearances, but he denied any involvement. On July 15, 1994, after further questioning by investigators, appellant, who was then under arrest in an unrelated case, gave a

written statement in which he confessed to the burglary. He continued to insist, however, that he knew nothing about the disappearances. A Walker County grand jury subsequently indicted appellant for the burglary.

On August 15, 1994, attorney Hal Ridley was appointed to represent appellant in the burglary case. Shortly thereafter, Walker County investigators sought Ridley's permission to question appellant again about the disappearances. Ridley gave his permission, but only after being assured that appellant was not a suspect in the disappearances. The investigators then questioned appellant, and he again denied any involvement.

On September 13, 1995, Walker County investigators again sought Ridley's permission to question appellant about the disappearances, and again he gave permission, still believing that appellant was not a suspect. During the questioning, appellant again denied any involvement.

On November 11, 1995, appellant's father, Charles Cobb, who resided in Odessa, telephoned the Walker County Sheriff's Office with information regarding appellant, who was then free on bond in the still-pending burglary case and also residing in Odessa. Mr. Cobb reported that appellant had just confessed to him that he had killed Margaret Owings while in the course of burglarizing her home and that he had buried her body in a wooded area not far from the home. Walker County investigators instructed Mr. Cobb to proceed to an Odessa police station to give a statement, which he did. The Odessa police faxed Mr. Cobb's statement to Walker County, and investigators there used the statement to obtain an arrest warrant, which they faxed back to Odessa. The Walker County investigators neglected, however, to inform the Odessa police that

appellant had counsel in the burglary case. The Odessa police then located appellant, arrested him, Mirandized[2] him, and interrogated him. After ninety minutes of questioning, appellant gave a written statement in which he admitted killing both Margaret and Kori Rae Owings while in the course of burglarizing their home.

 Having explicated the relevant facts, we turn now to the relevant law, which is both settled and familiar. The Sixth Amendment to the Constitution of the United States provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." This right to counsel was made applicable to state felony prosecutions by the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963). The purpose of the right to counsel is to protect the unaided layman after the adverse positions of government and defendant have solidified with respect to a particular alleged crime. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991). The right thus attaches at the initiation of adversarial proceedings, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment, and no request for counsel need be made by the accused. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 1239, 1242, 51 L.Ed.2d 424 (1977). Once the Sixth Amendment right to counsel attaches, government efforts to elicit information from the accused, including interrogation, represent "critical stages" at which the right to counsel applies. *Michigan v. Jackson*, 106 S.Ct. at 1407–1408. Therefore, for the fruits of post-indictment interrogations to be admissible in a prosecution's case-in-chief, the State must prove a voluntary, knowing, and intelligent waiver of the right to counsel. *Patterson v. Illinois*, 487

**2.** See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6**

U.S. 285, 108 S.Ct. 2389, 2394–2395, 101 L.Ed.2d 261 (1988). However, once the right to counsel has attached and has been invoked, any subsequent waiver during police-initiated interrogation is ineffective unless counsel has first given permission for the interrogation. *Michigan v. Jackson*, 106 S.Ct. at 1411.

 Also relevant to this case is the Sixth Amendment rule that once the right to counsel attaches to the offense charged, it also attaches to any other offense that is very closely related factually to the offense charged. *State v. Frye*, 897 S.W.2d 324, 328–329 (Tex.Crim.App.1995); *Upton v. State*, 853 S.W.2d at 555–556; accord, *United States v. Arnold*, 106 F.3d 37, 41 (3 rd Cir.1997), and cases cited therein; see 2 W. LaFave, et al., *Criminal Procedure* § 6.4(f) n. 127 (2nd ed.1999). This rule prevents the government from circumventing the Sixth Amendment right to counsel merely "by charging a defendant with additional crimes after questioning him without counsel present," *United States v. Arnold*, 106 F.3d at 41, or "by charging predicate crimes with the purpose of questioning a suspect on an aggravated crime," *Upton v. State*, 853 S.W.2d at 556.

 Relevant to this case, too, is the "Sixth Amendment ... require[ment] that we impute the State's knowledge from one state actor to another." *Michigan v. Jackson*, 106 S.Ct. at 1410. "One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court)." *Ibid.*

We now apply these rules of law to the case at bar. Once appellant was indicted for the Owings burglary, his Sixth Amendment right to counsel attached to that offense *and* to the capital murder offense, which was factually interwoven with the burglary. It is also true that once appellant's right to counsel attached, he assert-

ed it by accepting Ridley's appointment as his counsel. Therefore, before the Odessa police could lawfully question appellant about the disappearances of the Owings, they were under an obligation to contact Ridley and get his permission. They failed to do that. Consequently, the fruits of the Odessa police interrogation, including appellant's written statement, were inadmissible in the prosecution's case-in-chief.

The fact that Ridley twice gave permission to Walker County investigators to question appellant is irrelevant. Nothing in the record suggests that Ridley's permission was intended to be continuing or could have reasonably been so interpreted.

 Having found constitutional error, we still need not reverse appellant's conviction if we determine that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); Tex. R.App. Proc. 44.2(a). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988).

The record reflects that appellant's statement was incriminating and central to the prosecution's case against him. Therefore, a reasonable likelihood exists that the admission of the statement in evidence materially affected the jury's deliberations.

We sustain appellant's fourth point of error. In view of our disposition of appellant's fourth point of error, we need not address his remaining points of error. The judgment of the trial court is reversed, and the case is remanded for a new trial.

McCORMICK, P.J., filed a dissenting opinion, in which KELLER and KEASLER, JJ., joined.

McCORMICK, P.J, delivered a dissenting opinion in which KELLER and KEASLER, JJ., joined.

I respectfully dissent. Neither the facts nor the law support the Court's decision to suppress appellant's voluntary confession.

Because appellant lost in the trial court on his suppression motion, no one can dispute that the Court is required to view the evidence in the light most favorable to the trial court's decision to admit appellant's voluntary confession.[1] But, the Court's opinion does not view the evidence this way and, consequently, it misstates key facts upon which it decides to suppress appellant's voluntary confession.

More important is that even under the Court's version of the facts, the law is not as "settled and familiar" as the Court's opinion would have it. Various United States Supreme Court precedents can be read to support two contrary holdings in this case. I would either apply the body of law that balances the competing interests in favor of admitting appellant's voluntary confession [2] or, assuming the other body of law requires suppression of appellant's voluntary confession, I would decline to follow it.

## I. THE RELEVANT FACTS UNDER A PROPER APPLICATION OF THE *GUZMAN* STANDARD OF REVIEW REQUIRING THE COURT TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE TRIAL COURT'S RULING ON APPELLANT'S SUPPRESSION MOTION.

Appellant voluntarily confessed during police-initiated custodial interrogation to murdering a mother and burying her baby alive. According to appellant's voluntary confession, he stabbed the mother while burglarizing her home. He took the mother's body to some "woods a good ways away from the house, maybe two or three hundred yards from her house." Appellant's voluntary confession then states:

"I went back to her house and I saw the baby laying on its bed. I took the baby out there and it was sleeping the whole time. I laid the baby down on the ground four or five feet away from its mother. I went back to my house and got a flat edge shovel. That's all I could find. Then I went back over to where they were and I started digging a hole between them. After I got the hole dug, the baby was awake. It started going toward its mom and it fell in the hole. I put the lady in the hole and I covered them up. I remember stabbing a different knife I had in the ground where they were. I was crying right then."

Appellant made this voluntary confession approximately 15 months after Ridley had been appointed to represent appellant on a formal charge of burglarizing the victims' home. During these 15 months appellant admitted only to burglarizing the victims' home. Also, during these 15 months the police were unable to find the victims. The police considered appellant a suspect in the victims' disappearances. Appellant made bond in the burglary case and he moved to another town.

When appellant voluntarily confessed to murdering the victims, appellant had been arrested on a warrant which was based on

---

1. See *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Cr.App.1997).

2. See *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 2210, 115 L.Ed.2d 158 (1991) ("ready ability to obtain uncoerced confessions is not an evil but an unmitigated good" and is "essential to society's compelling interest in finding, convicting, and punishing those who violate the law").

new information the police received from appellant's father who implicated appellant in the victims' murders. Appellant had confessed to his father that he killed the victims.

Soon after appellant's arrest the police questioned appellant and he voluntarily confessed to murdering the victims. Ridley was unaware that appellant's father had implicated appellant in the victims' murders or that appellant had been arrested for and questioned by the police about the victims' murders.

Before appellant voluntarily confessed, the police informed appellant of his right to have a lawyer present during the interrogation and appellant unilaterally and voluntarily waived that right. The police who obtained appellant's confession were unaware that Ridley represented appellant in the burglary case. Shortly after appellant voluntarily confessed, he led the police to where he buried the victims' bodies.

The Court's opinion asserts as a matter of fact that Ridley gave the police permission to question appellant "but only after being assured that appellant was not a suspect in the disappearances." The implication seems to be that any permission the police had from Ridley to question appellant when appellant voluntarily confessed was ineffective because this permission was obtained fraudulently. But, viewed in the light most favorable to the trial court's ruling, the evidence supports a contrary finding.

Although Ridley testified that he did not know until September 1995 that appellant was a suspect in the victims' disappearances, Ridley also admitted that the police "always said they thought [appellant] knew more than what he was saying" about the victims' disappearances.

"Q. You have heard the testimony the last two days from Detective Judy James and Detective Debbie Funk—or actually you did not hear Debbie Funk's testimony, but they indicated that Cobb was always a suspect in this case.

"A. Well, I had gone out to the jail on another matter later. After Haley and James spent about three hours with him that day I went out to the jail, probably the next week, to see some other people and got in a conversation with Sheriff Meyers. And Sheriff Meyers at that time personally told me that he thought Cobb was a suspect all along. He flat told me he thought Cobb was guilty; he just couldn't prove it. And that was the first time I was aware—

"Q. What date is—

"A. This would have been about a week after Haley and James talked to him. It was that same month. This was prior to the news breaking, though, that he had given a statement.

"Q. This was after Haley and James' contact with him with your permission on September 13, 1995, approximately a week later?

"A. Right.

"Q. But prior to that no law enforcement personnel had ever informed you that Cobb was a suspect?

"A. *They always said they thought he knew more than he what he was saying,* but in fact I still had no reason to believe the person I was originally informed was the suspect wasn't still the suspect." (Emphasis Supplied).

This testimony together with the evidence that appellant admitted burglarizing the victims' home at the time they disappeared support a finding that Ridley knew all along that appellant was a suspect in the victims' disappearances. And, even if Ridley did not know until September 1995 that appellant was a suspect, there still is no evidence that upon learning this information Ridley withdrew the unqualified

permission he had twice given to the police to question appellant.

The Court's opinion, however, asserts as a matter of fact that this is "irrelevant" because nothing "in the record suggests that Ridley's permission was intended to be continuing or could have reasonably been so interpreted." Viewed in the light most favorable to the trial court's ruling, the evidence supports contrary findings.

Ridley twice gave the police permission to question appellant. Significantly, neither the police nor Ridley testified that this permission was in any way limited. Detective Haley testified that in September 1995 when Ridley gave him permission to question appellant and when, according to Ridley, this was when Ridley learned appellant was a suspect in the victims' disappearances, Ridley "said it was okay, if it was okay with" appellant.

"Q. This was on September—

"A. September the 13 th, 1995.

"Q. And he agreed to participate or cooperate with you?

"A. Yes, sir.

"Q. *In fact you discussed this with his attorney and the attorney said it was okay, if it was okay with [appellant]?*

"A. Yes, sir." (Emphasis Supplied).

Ridley testified that he allowed law enforcement to speak with appellant.

"Q. You have always allowed law enforcement to speak with your clients even outside your presence?

"A. I have in the past, or—

"Q. Yes.

"A. I have in the past on certain occasions, and I did in this case."

Ridley even gave the police permission to take appellant to the location of the victims' bodies soon after appellant voluntarily confessed to murdering them.

"Q. All right.

"A. And then I was contacted the next evening, and I thought—it may have been James that called me, but I thought it was David Weeks that asked if [appellant] could go out there and—

"Q. Again?

"A. Yeah. This would have been the next night, and asked if [appellant] could go out there or if I had any objections to him going out there with Haley and James. And then he left me—I think he left me the number to call James directly and contact her. I think that's how that went because for some reason I almost want to swear that I was—I had talked to him first about it. And I told him, 'Well, you know, I don't know what else he could tell you,' *but I did not deny them permission to take him out there.*" (Emphasis Supplied).

Ridley also testified that any contact the police may have had with appellant after November 14 th "was without [his] permission."

"Q. To the best of your knowledge he has not had any further contact?

"A. Shouldn't have had after [November 14 th]. *If he did, it was without my permission.*" (Emphasis Supplied).

From this testimony alone, the trial court could have found that the police had Ridley's permission to question appellant at any time before November 14, 1995. Contrary to the factual assertions in the Court's opinion, there is evidence in the record to support a finding "that Ridley's permission was intended to be continuing" as long as "it was okay" with appellant.

As to the Court's factual assertion that Ridley's permission could not reasonably have been interpreted as being continuing, the evidence, viewed in the light most favorable to the trial court's ruling, supports a contrary finding. The record supports a finding that, having twice received permis-

sion from Ridley to question appellant, the police without contacting Ridley questioned appellant on other occasions even though Ridley might have been under the impression that the police contacted him whenever they wanted to question appellant.[3]

For example, Detective Thomas testified that the police had questioned appellant on "previous occasions."

"Q. So to clarify this, Detective James indicated to you that they had talked to [appellant] on previous occasions and he had never indicated on these previous occasions that he had any involvement in the disappearance of the [victims]?

"A. Right."

Later, Detective Thomas testified that the police had questioned appellant "several times."

"Q. All right. What happened next?

"A. Detective Sikes began a line of questioning about the disappearance of the [victims], and [appellant] denied it. *[Appellant] went into about talking to the investigators here in Walker County, and he said he had already spoken with them several times.* He had been arrested on a burglary charge stemming out of this same investigation. *And he denied over and over* that he had nothing (sic) to do with them missing, and he got somewhat agitated with Detective Sikes." (Emphasis Supplied).

In any event it makes no difference that the police may have contacted Ridley whenever they wanted to question appellant because, viewed in the light most favorable to the trial court's ruling, the evidence supports a finding that the police had Ridley's permission to question appellant at any time before November 14th as long as "it was okay" with appellant. In deciding otherwise, the Court misapplies the *Guzman* standard of review by not viewing the evidence in the light most favorable to the trial court's ruling on appellant's suppression motion.

## II. EVEN UNDER THE COURT'S VERSION OF THE FACTS, APPELLANT'S VOLUNTARY CONFESSION IS STILL ADMISSIBLE

The Court decides: (1) the police violated a prophylactic rule meant to safeguard the Sixth Amendment right to counsel when the police initiated questioning of appellant after he had "asserted" his Sixth Amendment right to counsel during arraignment on the burglary charge some 17 months before appellant confessed, and (2) suppression of appellant's voluntary and reliable confession is the appropriate remedy as a means to deter the kind of "egregious police misconduct" that the Court implicitly decides occurred in this case. I would decide that the police did not violate any prophylactic rule meant to safeguard the Sixth Amendment right to counsel and that appellant made a valid waiver of his Sixth Amendment right to counsel before he voluntarily confessed.

For reasons more fully set out in this opinion, the federal constitutional issue actually presented is: can a represented-by-counsel defendant whose Sixth Amendment right to counsel has attached to an offense unilaterally make a valid waiver of this Sixth Amendment right to counsel

---

3. "Q. So prior to November, 1995, every time the law enforcement officials and/or members of the District Attorney's Office decided they needed to talk to [appellant] concerning the disappearance of [the victims] they always contacted you and asked you for your permission?

"A. I would say yes *because [appellant] never called me and indicated otherwise,* and on each occasion I gave my permission believing he wasn't a suspect." (Emphasis Supplied).

upon police-initiated interrogation about this offense? Some United States Supreme Court precedent supports holding that such a defendant can unilaterally make a valid waiver of his Sixth Amendment right to counsel even when that defendant previously has asserted his Sixth Amendment right to counsel. See generally *State v. Frye*, 897 S.W.2d 324, 331–32 (Tex.Cr.App.1995) (McCormick, P.J., concurring and dissenting).

In *Brewer v. Williams*, the United States Supreme Court in a lead opinion authored by Justice Stewart and joined by Justice Brennan decided that a defendant in a case like this did not validly waive his Sixth Amendment right to counsel. See *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977). The Court, however, decided that such a defendant could unilaterally make a valid waiver of his Sixth Amendment right to counsel even when the defendant previously has asserted his right to counsel, otherwise it would have been unnecessary for *Brewer* to decide whether the defendant validly waived his right to counsel:

> "Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no

effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel.

"The Court of Appeals did not hold, nor do we, that under the circumstances of this case[4] [the defendant] *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. [Footnote Omitted]. It only held, as we do, that he did not."

*Williams*, 97 S.Ct. at 1243 (Emphasis in Original); see also *Frye*, 897 S.W.2d at 332 (McCormick, P.J., concurring and dissenting).

Several Justices filed separate concurring and dissenting opinions in *Brewer*. Justice Marshall's and Justice Powell's concurring opinions joined Justice Stewart's lead opinion. See *Brewer*, 97 S.Ct. at 1244–45 (Marshall, J., concurring) and 97 S.Ct. at 1245–47 (Powell, J., concurring). Justice Stevens' concurring opinion also joined Justice Stewart's lead opinion and the concurring opinions of Justices Powell and Marshall. See *Brewer*, 97 S.Ct. at 1247–48 (Stevens, J., concurring).[5]

Chief Justice Burger filed a dissenting opinion. See *Brewer*, 97 S.Ct. at 1248–55

---

4. Consistent with how the Court's opinion characterizes the circumstances of this case, the "circumstances of [the *Brewer*] case" involved police-initiated interrogation of a represented-by-counsel and formally charged defendant who had asserted his Sixth Amendment right to counsel. See *Brewer*, 97 S.Ct. at 1242–43.

5. The concurring opinions of Justices Marshall, Powell and Stevens arguably failed *to* understand that Justice Stewart's lead opinion decided that the defendant unilaterally or "without notice to counsel" could have made a valid waiver of his "rights under the Sixth

and Fourteenth Amendments." Compare *Brewer*, 97 S.Ct. at 1243 (Stewart, J.), *with,Brewer*, 97 S.Ct. at 1244–45 (Marshall, J., concurring) (apparently would have decided that the defendant could not unilaterally make a valid waiver of his Sixth and Fourteenth Amendment rights), and 97 S.Ct. at 1246 (Powell, J., concurring) (erroneously claiming that Justice Stewart's lead opinion was "explicitly clear that the right to assistance of counsel may [not] be waived, after it has attached, without notice to or consultation with counsel"), and 97 S.Ct. at 1247–48 (Stevens, J., concurring).

(Burger, C.J., dissenting). His dissenting opinion, consistent with Justice Stewart's lead opinion, recognized "that a valid waiver was *possible* in these circumstances, but was not quite made." See *Brewer,* 97 S.Ct. at 1250 (Burger, C.J., dissenting) (Emphasis in Original).

Justice White also filed a dissenting opinion which was joined by Justices Rehnquist and Blackmun. See *Brewer,* 97 S.Ct. at 1255–59 (White, J., dissenting). His dissenting opinion, consistent with Justice Stewart's lead opinion, also recognized that Justice Stewart's lead opinion created "no new rule preventing an accused who has retained a lawyer from waiving his right to the lawyer's presence during questioning." See *Brewer,* 97 S.Ct. at 1257 (White, J., concurring).

So, as things stood in 1977 when *Brewer* was decided, at least six United States Supreme Court Justices, a majority, shared the view that a defendant could unilaterally make a valid waiver of his Sixth Amendment right to counsel even when the defendant previously has asserted his Sixth Amendment right to counsel. See *Brewer,* 97 S.Ct. at 1243 (Stewart, J., joined by Brennan, J.), and 97 S.Ct. at 1250 (Burger, C.J., dissenting), and 97 S.Ct. at 1257 (White, J., dissenting, joined by Blackmun and Rehnquist, J.J.).[6] And, as late as 1985 other United States Supreme Court precedent was consistent with *Brewer* in Sixth Amendment cases[7] despite the soon to be discussed United States Supreme Court adoption of various prophylactic rules in the Fifth Amendment context.

This brings us to the "relevant law" which the Court's opinion claims is "settled and familiar." The Court's opinion relies on *Michigan v. Jackson* which in 1986 applied the just mentioned Fifth Amendment *Miranda v. Arizona/Edwards v. Arizona*[8] prophylactic rules to the Sixth Amendment context. See *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986).[9] *Jackson* held that "if police initiate interrogation

**6.** And, arguably the three other Justices in *Brewer* subscribed to this view since they joined Justice Stewart's lead opinion instead of concurring in the judgment or the result.

**7.** See *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1144, 89 L.Ed.2d 410 (1985) ("It is clear, of course, that, *absent a valid waiver,* the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches"). (Emphasis Supplied).

**8.** See *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**9.** Just as the *Miranda v. Arizona/Edwards v. Arizona* prophylactic rules are *not* Fifth Amendment rights but are meant to safeguard the underlying Fifth Amendment right against compelled self-incrimination, the *Jackson* prophylactic rule also is *not* a Sixth Amendment right but is meant to safeguard the underlying Sixth Amendment right to counsel. See *Baker v. State,* 956 S.W.2d 19, 23–24 (Tex.Cr.App. 1997). This raises the question of whether, under principles of federalism, we are even required to follow *Jackson.* See *United States v. Dickerson,* 166 F.3d 667, 672 (4th Cir.), cert. granted, 528 U.S. 1045, 120 S.Ct. 578, 145 L.Ed 2d 481 (1999) (*Miranda* is not a constitutional rule so Congress had the power to overrule it).

It also should be noted that the United States Supreme Court is currently reconsidering *Miranda* in favor of a pure voluntariness test. See *id.;* see also *Brewer,* 97 S.Ct. at 1259 (Blackmun, J., dissenting) (noting that at least 22 states were urging the Supreme Court to overrule *Miranda*). If the Supreme Court overrules *Miranda* and adopts a voluntariness test, then that would render cases like *Edwards* and *Jackson* obsolete and the issue in this case moot. The Court should, therefore, hold this case until the Supreme Court decides whether to retain *Miranda.*

after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any [unilateral] waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." See *Jackson*, 106 S.Ct. at 1411.

But, *Jackson*, instead of overruling or disapproving *Brewer*, actually relied on *Brewer*. See *Jackson*, 106 S.Ct. at 1410 fn. 9. This is curious since *Brewer* is flatly inconsistent with and contrary to *Jackson's* holding. See *Jackson*, 106 S.Ct. at 1413 (Rehnquist, J., dissenting). This creates a conflict between *Brewer* and *Jackson* either of which the Court may choose to apply.

And, having chosen to apply *Jackson*, the Court's opinion fails to appreciate that this case is distinguishable from *Jackson* in three important respects. In *Jackson* the police initiated interrogation of the defendants shortly after their "request" for counsel at arraignment. See *Jackson*, 106 S.Ct. at 1406. In this case, however, the police initiated interrogation some 17 months after appellant's arraignment.[10]

Another distinction between this case and *Jackson* is that appellant did not unequivocally assert his right to counsel at any time before the police-initiated interrogation. The evidence is to the contrary.[11]

The other distinction between this case and *Jackson* is that after any assertion of appellant's right to counsel at arraignment the police twice received permission from appellant's lawyer to question appellant and the police questioned appellant on "numerous occasions" over a 17 month period without any objections from appellant or his lawyer. These actions by appellant and his lawyer amount to a type of waiver of any previous assertion of the right to counsel some 17 months before appellant confessed. Under these circumstances, it defies common sense to decide that a 17–month–old assertion of the right to counsel would still be effective. *Jackson*, therefore, is neither "relevant" nor controlling.

It now becomes necessary to address this Court's federal constitutional decisions

---

10. See *Jackson*, 106 S.Ct. at 1413 (Rehnquist, J., dissenting) ("the Court most assuredly does *not* hold that the *Edwards per se* rule prohibiting all police-initiated interrogation applies from the moment the defendant's Sixth Amendment right to counsel attaches, with or without a request for counsel by the defendant").

11. *Jackson* would not support the Court's holding unless appellant asserted his right to counsel. If appellant did not assert his right to counsel or if his or his lawyer's actions indicate some type of waiver of any previous assertion of this right, then the Court would have to find some other basis to exclude appellant's voluntary confession.

The Court's opinion decides appellant asserted his right to counsel "by accepting Ridley's appointment as his counsel" at appellant's arraignment on the burglary charge. This is not an unequivocal assertion of the right to counsel. See *Jackson*, 106 S.Ct. at 1406 (defendants explicitly requested appointment of counsel at their arraignment). At

most, appellant's "accepting Ridley's appointment as his counsel" was an equivocal assertion of the right to counsel.

This cannot be considered an assertion of the right to counsel under United States Supreme Court precedent decided after *Jackson*. See *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994) (police interrogation need not cease in response to equivocal assertion of right to counsel); *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex.Cr.App.1996) (same rule with respect to equivocal assertions of right to remain silent). These rules apply in cases like this since they too are just an extension of the *Miranda v. Arizona/Edwards v. Arizona* line of cases. The Court, therefore, should analyze whether appellant asserted his right to counsel under these cases. The *point is that something* which *Jackson* might have considered an assertion of the right to counsel may not be so under these later cases that were decided after *Jackson*.

in *Holloway v. State,*[12] *Upton v. State,*[13] and *Frye v. State.*[14] *Holloway* clearly decided, as a matter of federal constitutional law, that a represented-by-counsel defendant cannot unilaterally make a valid waiver of his Sixth Amendment right to counsel during police-initiated interrogation on offenses to which the Sixth Amendment right to counsel has attached. See *Holloway,* 780 S.W.2d at 795–96. Under *Holloway,* it makes no difference whether this defendant previously has asserted his right to counsel.[15]

*Holloway* relied on various United States Supreme Court decisions none of which clearly support its holding. More important, *Holloway* did not address *Brewer.*[16] *Holloway* noted that in *Patterson v. Illinois,*[17] which came after *Jackson,* the Supreme Court decided that an unrepresented-by-counsel defendant who had not previously asserted his right to counsel could unilaterally make a valid waiver of his Sixth Amendment right to counsel. See *Holloway,* 780 S.W.2d at 794–95.

*Holloway's* contrary holding for a represented-by-counsel defendant was based in part on footnote three of *Patterson* which says "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect" where an accused's Sixth Amendment

12. *Holloway v. State,* 780 S.W.2d 787 (Tex.Cr. App.1989).

13. *Upton v. State,* 853 S.W.2d 548 (Tex.Cr. App.1993).

14. *Frye,* 897 S.W.2d at 327–29.

15. This Court originally affirmed the defendant's conviction in *Holloway.* See *Holloway,* 780 S.W.2d at 788. After granting the defendant's petition for certiorari, the United States Supreme Court remanded the case to this Court for reconsideration in light of *Jackson.* See *Holloway v. Texas,* 475 U.S. 1105, 106 S.Ct. 1508, 89 L.Ed.2d 908 (1986); *Holloway,* 780 S.W.2d at 788. On remand from the United States Supreme Court, this Court rejected the defendant's claim based on *Jackson* by deciding that the defendant never asserted his right to counsel. See *Holloway,* 780 S.W.2d at 790 (deciding that *Jackson* was inapplicable). This Court, however, went on to reverse the case based on another soon to be discussed case the United States Supreme Court decided after *Jackson.* See *Holloway,* 780 S.W.2d at 794–96.

16. For example, *Holloway* cited *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). This is the case where a police agent secretly recorded conversations between the defendant and his lawyer. See *Moulton,* 106 S.Ct. at 487. *Moulton* and cases like it do not support *Holloway's* holding because in these cases "the nature of the police conduct was such that it would have been impossible to find a valid waiver of the defendant's Sixth Amendment right to counsel." See *Jackson,* 106 S.Ct. at 1414 (Rehnquist, J., dissenting).

 *Holloway* also relied on United States Supreme Court jurisprudence on a capital defendant's Sixth Amendment right to counsel during psychiatric examinations on the future dangerousness punishment issue. *Holloway,* 780 S.W.2d at 795–96; see *Powell v. Texas,* 492 U.S. 680, 109 S.Ct. 3146, 3149–50, 106 L.Ed.2d 551 (1989) (formally charged capital defendant's Sixth Amendment right to counsel precludes psychiatric examination on future dangerousness without notice to counsel). In *Powell,* the defendant was neither warned of his rights during the psychiatric examination nor was his counsel notified of the psychiatric examination. See *Powell,* 109 S.Ct. at 3148. The Supreme Court decided that this violated the defendant's Sixth Amendment right to counsel. See *Powell,* 109 S.Ct. at 3150. Consistent with *Brewer,* however, part of the rationale for the Supreme Court's decision in *Powell* was that there was "no basis for concluding that [the defendant] waived his Sixth Amendment right." See *id.* *Powell* did not decide whether the defendant could have unilaterally waived this right. The *Powell* line of cases, therefore, do not clearly support *Holloway's* holding.

17. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).

right to counsel has attached and he is represented by counsel.[18] The Supreme Court has yet to decide what these "distinct set of constitutional safeguards" are.

*Upton* and *Frye* relied mainly on *Holloway* and the authorities upon which *Holloway* relied. *Upton* also noted a possible conflict between *Holloway* and *Brewer*. See *Upton*, 853 S.W.2d at 553 fn. 2. For these reasons, I would decline to follow *Holloway*, *Upton* and *Frye*.

With this in mind, it is clear that *Brewer* and *Jackson* conflict on whether a represented-by-counsel defendant can unilaterally make a valid waiver of his Sixth Amendment right to counsel when that defendant previously has asserted his Sixth Amendment right to counsel. *Brewer* says he can. *Jackson* says he cannot. *Patterson* further muddies the waters when it says that in cases like this a "distinct set of constitutional safeguards" exists without saying what these safeguards are. The law is not as "settled and familiar" as the Court's opinion says.[19] There needs to be some clarification on the "waiver" issue and on what "distinct set of constitutional safeguards" exists in cases like this.

Until this happens, I would decide consistent with *Brewer* and a proper balancing of the competing interests that a defendant can unilaterally make a valid waiver of his Sixth Amendment right to counsel in cases like this even when this defendant previously has asserted his right to counsel or, as the Court's opinion says, has "accepted" appointment of counsel. There is enough ambiguity and conflict in existing United States Supreme Court case law for this Court to give the benefit of the doubt to the law-abiding citizens of this state and decide that appellant's voluntary confession should be admitted into evidence. This is especially true since we are only dealing with alleged violations of prophylactic rules and not violations of constitutional rights. To the extent *Jackson's* prophylactic rule would require a contrary result, I would decline to follow it. See *Dickerson*, 166 F.3d at 672.[20]

### III. HARM

I also would decide that admission of appellant's voluntary confession was harmless. Any error in the admission of appellant's voluntary confession was rendered harmless by the admission of appellant's confession to his father that he murdered the victims. See *Leday v. State*, 983 S.W.2d 713, 717 (Tex.Cr.App.1998). The evidence further shows appellant burglarized the victims' home at the time of their disappearances. The jury would have used this evidence and the other evidence presented by the prosecution to convict

---

18. See *Patterson*, 108 S.Ct. at 2393 fn. 3; *Holloway*, 780 S.W.2d at 795.

19. See *Jackson*, 106 S.Ct. at 1414 (Rehnquist, J., dissenting) ("Court lacks a coherent, analytically sound basis for its decision" in cases like this).

20. I also disagree with the Court's *McNeil v. Wisconsin* analysis. See *McNeil*, 111 S.Ct. at 2207. I would decide that appellant's Sixth Amendment right to counsel on the capital murder offense had not attached when appellant confessed to this offense. See *McNeil*, 111 S.Ct. at 2207 (Sixth Amendment right to counsel is offense-specific).

The facts of this case are much different than the facts of *Upton* and do not fall within *Upton's* "exception" to a "strict application" of *McNeil*. See *Upton*, 853 S.W.2d at 554–56. In *Upton* the defendant confessed to the capital offense after having been in custody for approximately two weeks after he committed the offense. See *id.*

In this case, appellant confessed approximately 17 months after he committed the offense during which time he was on the streets. The potential for police abuse identified in *Upton* does not exist here. See *id.*

appellant with or without his voluntary confession.

## IV. TAINTED "FRUIT"

Finally, it should be noted that any "fruits" of appellant's voluntary confession are admissible. This is because the Court decides that appellant's voluntary confession was obtained in violation of only a prophylactic rule meant to safeguard Sixth Amendment rights. See *Jackson*, 106 S.Ct. at 1411; *Baker*, 956 S.W.2d at 23–24. The "fruits" of voluntary confessions obtained in violation of prophylactic rules are admissible. See *id*. And, I do not understand the Court's opinion to decide that the prosecution is precluded from making this claim on remand since the prosecution has had no reason to raise it earlier.

I respectfully dissent.