**Raymond Levi COBB, Appellant,**

v.

**The STATE of Texas.**

**No. 72807.**

Court of Criminal Appeals of Texas.

May 29, 2002.

Rehearing Denied Aug. 21, 2002.

---

12. *Ante* at ——.

Roy E. Greenwood, Austin, for Appellant.

David P. Weeks, DA, Huntsville, Matthew W. Paul, State's Atty., Austin, for State.

### OPINION ON REMAND FROM THE UNITED STATES SUPREME COURT

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, HERVEY and HOLCOMB, JJ., joined.

Appellant was convicted of capital murder for intentionally killing Margaret Owings and her sixteen-month-old daughter, Kori Rae.[1] Based upon the jury's answers to the special issues, he was sentenced to death. On direct appeal to this Court, appellant claimed that Odessa police officers obtained his confession in violation of his Sixth Amendment right to counsel. Appellant argued that because he had already been charged for burglarizing the Owings' home and had an attorney appointed to represent him on that charge, his Sixth Amendment right to counsel at-

---

1. TEX. PENAL CODE § 19.03(a)(7).

tached to both that offense *and* to the related capital murder of Mrs. Owings and her daughter to which he confessed fifteen months later. This Court agreed and held that: "[o]nce appellant was indicted for the Owings burglary, his Sixth Amendment right to counsel attached to that offense *and* to the capital murder offense, which was factually interwoven with the burglary." *Cobb v. State,* —— S.W.3d ——, 2000 WL 275644, 2000 Tex.Crim.App. LEXIS 32 (Tex.Crim.App. Mar. 15, 2000). The United States Supreme Court granted *certiorari* and reversed this Court's decision, holding that because the Sixth Amendment right to counsel is "offense specific," it does not extend to offenses that are "factually related" to those which have actually been charged. *Texas v. Cobb,* 532 U.S. 162, 167, 173–74, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001). The case was remanded to us to consider appellant's remaining points of error. We now affirm the conviction and sentence.

## I.

We briefly review the pertinent facts. On December 27, 1993, Mr. Lindsey Owings called police to report a burglary at his home in Walker County and that his wife and child were missing. During their initial investigation, officers questioned appellant, who lived across the street from the Owings, but appellant denied any knowledge of the burglary or disappearances. Six months later, in July, 1994, however, appellant admitted to burglariz-

ing the Owings house, but continued to deny any role in the disappearance of Mrs. Owings and her daughter. Following appellant's August, 1994 indictment for burglary, the trial court appointed counsel, Mr. Hal Ridley, to represent him. Mr. Ridley attempted to reach a plea agreement with the district attorney on the burglary charge, and on several occasions he therefore allowed law enforcement officers to question appellant outside his presence. Appellant remained adamant that he knew nothing about the disappearance of Mrs. Owings and her daughter. In June, 1995, appellant's father, Charles Cobb, bailed his son out of jail in Walker County, and appellant moved to Odessa, Texas, with his father.

The burglary charges were still pending in November, 1995 (almost two years after the Owings' disappearance), when appellant's father called Walker County officials from his home in Odessa. Mr. Cobb told Deputy Judy James that appellant had admitted to killing Mrs. Owings and burying her in the woods. Mr. Cobb also urged Deputy James to get an arrest warrant, because appellant planned to leave Odessa the next morning. Mr. Cobb repeated the substance of appellant's confession in a written statement to Odessa police officers, who then faxed it to the Walker County District Attorney's Office. Walker County officials used Mr. Cobb's written statement to obtain an arrest warrant for appellant on capital murder charges.[2]

---

**2.** Mr. Cobb's statement read, in pertinent part:

About 9:00 p.m. tonight, I went to my son, Raymond Cobb's house at 1918 Golder.... We got to Raymond's house and he came out. I told him to get in the car, that we needed to talk.... We talked for a little while and I kept pumping him for the answers. He broke down crying and told me

he had killed the woman. I asked him why and how.
He told me he was stoned on drugs, that he went to break into the house. He said he looked in the window and didn't see anyone. He said the door was unlocked and he just walked in. He took a quick glance around and didn't see anyone, so he just started gathering stuff up so he could get to them real easy. He turned around to go

Odessa police officers arrested appellant on that warrant and informed him of his *Miranda*[3] rights. Appellant said that he would speak to the officers. The officers took appellant's written statement,[4] in which he confessed to the murders. Appellant admitted that he was in the middle of burglarizing the Owings' house when Mrs. Owings walked in and saw him. He stabbed her in the stomach with a knife he was carrying and then dragged her body outside and to a nearby wooded area. When he came back to the house he noticed the sleeping child, so he picked her up, and carried her out to where he had left Mrs. Owings. He dug a hole, then the child woke up and "fell in the hole." He put Mrs. Owings in the hole and buried them both. He then stole various items from their home. Upon his return to Walker County in 1995, appellant led officers to the shallow grave in which he had buried mother and child.

## II.

In three related points of error on remand, appellant challenges the admissibility of his written confession. He contends that Odessa police officers violated his right to counsel under the Fifth Amendment to the United States Constitution and under Article I, section 10 of the Texas Constitution in obtaining his confession.

back into the living room and that this woman jumped on him from behind and was trying to choke him. He said he stabbed her and killed her. He didn't say how many times he stabbed her. I asked him about the blood, and he said she didn't bleed. I asked him what he had done with her and he said he carried her off in the woods and buried her where no one would find her. I asked him what about the little girl, and he just said: "She's dead." He told me that he was by himself completely. He told me he was sorry he done it and asked me to help him.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant argues that his August, 1994, Walker County indictment for the Owings burglary and the consequent appointment of counsel on that charge prohibited Odessa law enforcement officers from questioning him, some fifteen months later, about the dual murders he committed during that burglary, because the murders arose from the "same criminal episode."

### A. Appellant's Fifth Amendment argument

■ We first observe that appellant does *not* argue that Odessa police officers violated his Fifth Amendment rights by failing to administer *Miranda* warnings. Rather, he argues that because he was appointed counsel in August 1994 regarding his burglary indictment, that legal representation encompassed any custodial questioning about the murders which occurred during that burglary. Therefore, appellant argues, questioning him about the murders outside the presence of his counsel violated his Fifth Amendment right to counsel and thus, his incriminating statement was illegally obtained.

■ Appellant's argument fundamentally misperceives the prophylactic purpose that Fifth Amendment *Miranda* warnings serve in custodial questioning.[5] The Fifth

4. *See* Tex Crim. Proc.Code Ann. art. 38.22.

5. *See, e.g., Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (*Miranda's* warning requirement rests on "the Fifth Amendment privilege against self-incrimination"); *Butler v. McKellar*, 494 U.S. 407, 411, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990) ("[T]he Fifth Amendment bars police-initiated interrogation following a suspect's request for counsel in the context of a separate investigation"); *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) ("[t]he Miranda Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights"); *Michi-*

Amendment is a guarantee against compelled self-incrimination. In this context, it guards against coercive custodial questioning by police; it protects a suspect from the possibility of physical or psychological "third degree" procedures. But it is the act of administering the *Miranda* warnings itself that primarily protects suspects subject to custodial interrogation. As the Supreme Court observed, "Full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." [6] A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted.[7] Although *Edwards v. Arizona*[8] provides an additional protection—if at any time during the interview a suspect requests an attorney, questioning must cease immediately—it is one that the suspect must affirmatively invoke.

In the instant case, appellant confessed to his father before any police officer began custodial questioning. There is no dispute that, once he was taken into custody in Odessa, officers gave appellant his *Miranda* warnings. Appellant was thus fully informed of his *Miranda* rights and he voluntarily and intelligently waived those rights before the police began questioning him. If appellant had changed his mind at any time during the interrogation, he could have then invoked his right to counsel or to silence in order to terminate the custodial questioning.[9] Appellant simply did not do so.

■ Appellant argues instead that the Supreme Court's holding in *Michigan v. Mosley*[10] does not apply to the facts of his case. In *Mosley*, the Supreme Court held that a suspect's invocation of his Fifth

gan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) ("The Fifth Amendment protection against compelled self-incrimination provides the right to counsel at custodial interrogations"); *Moran v. Burbine*, 475 U.S. 412, 427, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (referring to *Miranda* as "our interpretation of the Federal Constitution").

6. *Moran v. Burbine*, 475 U.S. at 427, 106 S.Ct. 1135.

7. *Id.* at 422–23, 106 S.Ct. 1135. The Supreme Court explained, "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.*

8. 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

9. *See Moran v. Burbine*, 475 U.S. at 422–23, 106 S.Ct. 1135; *Robinson v. State*, 851 S.W.2d 216, 223 (Tex.Crim.App.1991).

Of course, if appellant *had* invoked his right to counsel during any law enforcement questioning, the police would not have been free to question him about any related investigation until he had consulted counsel, unless appellant re-initiated communications. *See Arizona v. Roberson*, 486 U.S. 675, 682, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (stating that, "after a person in custody has expressed his desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel is made available to him, unless the accused himself initiates further communication, exchange, or conversation with the police"; rule applies to questioning concerning *any* offense, whether the same, related, or entirely separate from that for which he was originally questioned) (internal quotations and citations omitted).

10. 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (admissibility of custodial statement obtained after an arrestee has invoked his *Miranda* rights to remain silent depends on whether his "right to cut off questioning" was scrupulously honored; exercise of right to terminate interrogation does not prohibit all further questioning by police officers on all subjects for all time).

Amendment right to silence concerning custodial questioning about one crime did not bar officers from later reinitiating custodial questioning on an unrelated crime.[11] Appellant emphasizes that, in *Mosley*, the defendant was interrogated about and ultimately confessed to a "completely separate and distinct crime." Appellant contends that because the murders in this case arose from the same "criminal episode" as the burglary, rather than from a completely separate offense, the offenses are the "same" for purposes of Fifth Amendment right to counsel analysis and the *Mosley* holding simply does not apply in this instance.

Although *Mosley* did not address either the Fifth or Sixth Amendment right to counsel, it nonetheless answered the same question, regarding the *Fifth* Amendment, that the Supreme Court considered in this case regarding the *Sixth* Amendment. Namely, both constitutional provisions prohibit further questioning concerning the "same" offense when an accused invokes their protections. The critical question, then, is whether the burglary and the murders arising out of it are the "same" offense.

Appellant contends that, for Fifth Amendment purposes, the murders and the burglary are properly categorized as the same offense. He relies heavily on Texas Penal Code section 3.01 definition of

the same "criminal episode."[12] Although section 3.01(1) speaks of "offenses committed pursuant to the same transaction[,]"[13] the Supreme Court explained, in this very case, that for Fifth Amendment purposes, the "same" offense does not mean "factually related" or "factually intertwined" offenses.[14] Rather, the proper test to determine whether two offenses are the same or different for purposes of Double Jeopardy is that set forth in *Blockburger v. United States:*[15]

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.[16]

In this case, the Supreme Court expressly adopted the *Blockburger* "same offense" test to decide whether the *Sixth* Amendment right to counsel had attached to appellant's questioning about the two murders he committed during the burglary for which he was already charged.[17] It concluded that two offenses were *not* the "same" for purposes of Double Jeopardy and the Sixth Amendment right to counsel during post-charge interrogations if each offense requires proof of a fact that the other does not.

---

**11.** *Id.* at 103–04, 96 S.Ct. 321.

**12.** Under the Texas Penal Code, a "criminal episode"

means the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property, under the following circumstances:
(1) the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan; or

(2) the offenses are the repeated commission of the same or similar offenses.
 TEX. PENAL CODE § 3.01.

**13.** TEX. PENAL CODE § 3.01(1).

**14.** 532 U.S. at 173, 121 S.Ct. 1335.

**15.** 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

**16.** *Id.* at 304, 52 S.Ct. 180.

**17.** *Cobb,* 532 U.S. at 173–74, 121 S.Ct. 1335.

Under this definition, burglary and capital murder are clearly not the "same" offense.[18] Appellant offers no compelling reason for this Court to suppose that the Supreme Court would suddenly switch course to define the "same" offense differently for custodial interrogations under the Fifth Amendment (the same constitutional provision upon which the *Blockburger* test is based) than it did under the Sixth Amendment. Nor do we understand why this Court should export a Texas statute defining a "criminal episode" for purposes of joinder and severance of separate offenses into the federal constitution.[19]

■ Indeed, there are compelling reasons against such a proposition. As the Supreme Court stated in *McNeil v. Wisconsin*,[20] in rejecting a similar contention:

[I]f we were to accept petitioner's rule, most persons in pretrial custody for serious offenses would be *unapproachable* by police officers suspecting them of involvement in other crimes, *even though they have never expressed any unwillingness to be questioned.* Since the ready ability to obtain uncoerced confessions is not an evil, but an unmitigated good, society would be the loser. Admissions of guilt resulting from valid *Miranda* waivers are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.[21]

The Supreme Court's criticism in *McNeil* applies with equal force to the instant case.

18. Id. (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ("As defined by Texas law, burglary and capital murder are not the same offense under *Blockburger*")). The Court also stated: "We see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel. Accordingly, we hold that when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Id.* at 173, 121 S.Ct. 1335.

Appellant argues that because, after he confessed to the dual murders, he was also charged with a second count of capital murder, an intentional killing in the course of committing burglary (a charge that was later abandoned), this post-confession charging decision proves that the murders of Mrs. Owings and her daughter were necessarily the same offense, under *Blockburger*, as the burglary of the Owings' home for which he was originally charged. It does not. A murder committed *during* a burglary is simply not the *same offense as a burglary*. In this particular case, the burglary and the dual murders were related offenses, they did occur during one "criminal episode" or one "criminal transaction," and each offense shares some common statutory elements, but they are not the "same" offense for purposes of *Blockburger*.

Appellant is mixing the concept of a lesser-included offense with that of the "same offense" under *Blockburger*.

19. Only those offenses which are "separate and distinct" may be joined together under section 3.01. *See Moore v. State*, 677 S.W.2d 550, 556 (Tex.App.-Amarillo 1983, pet. ref'd). The purpose of the joinder rule is to achieve "convenience and efficiency, permitting one trial on the joined counts, and treating the separate offenses as one for sentencing purposes." *Haliburton v. State*, 578 S.W.2d 726, 729 (Tex.Crim.App.1979).

The federal system has a similar joinder rule which permits the government to try several different offenses at once:

if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

FED. R.CRIM. PROC. 8(a). Again, the joinder rules apply only to separate and distinct offenses.

20. 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

21. *Id.* at 181, 111 S.Ct. 2204 (emphasis in original); *see also Cobb*, 532 U.S. at 172, 121 S.Ct. 1335 (quoting *McNeil*).

The only factual distinction between the present situation and that in *McNeil* is that, in the latter case, the two offenses were entirely distinct events, separated by time and space. Here, however, appellant committed the two murders during the burglary for which he had already been charged. Furthermore, the Supreme Court, in this very case, explicitly rejected, under the Sixth Amendment, the same argument that appellant now makes under the Fifth Amendment.[22] The Court held that the Sixth Amendment bars law enforcement only from questioning a charged suspect without the knowledge or presence of his counsel regarding that specific charged offense.[23] That constitutional prohibition does not apply to other "distinct" or "interrelated" offenses.[24]

Moreover, the rule appellant suggests is logically untenable and impracticable. A single "criminal episode," as defined in Penal Code section 3.01,[25] includes the repeated commission of the same offense, any offenses committed according to a common scheme or plan, as well as all offenses that form a part of one criminal "transaction." It would encompass a Tuesday burglary of the Owings' home in Walker County, a Friday burglary of an apartment in Odessa, a Sunday burglary of a trailer home in Houston, and so forth.[26] How could police in each town be expected to know if an arrestee, who has intelligent-

ly and voluntarily waived his *Miranda* rights and wants to speak to law enforcement, has already been charged somewhere else with the "commission of the same or similar offenses"? And, if so charged, that he was already represented by an attorney and therefore cannot be questioned by police without the presence of his unidentified attorney. Appellant offers insufficient logical, legal, or public policy justification for such a rule.

### B. Appellant's Confession Was Not Obtained in Violation of the Texas Constitution.

Appellant also argues that we should adopt his position, that the right of counsel applies to all "related offenses," as a matter of state constitutional law. He argues that the Supreme Court was simply wrong on this issue and emphasizes the fact that lower federal courts had interpreted prior Supreme Court opinions as lumping together "same" and "interrelated" offenses in analyzing custodial questioning under the Fifth Amendment or a "critical stage" under the Sixth Amendment. Indeed, he is correct; the law was uncertain.[27] But now that the Supreme Court has clarified its rule, the federal courts will follow its lead on these federal constitutional questions.

Appellant next asks that we adopt the Supreme Court's dissenting opinion in this case[28] as Texas constitutional law. We

---

**22.** 532 U.S. at 173–74, 121 S.Ct. 1335.

**23.** 532 U.S. at 173–74, 121 S.Ct. 1335.

**24.** *Id.* at 174, 121 S.Ct. 1335.

**25.** *See* note 4 *supra*.

**26.** *See, e.g., Benavidez v. State,* 655 S.W.2d 233, 234–35 (Tex.App.-Corpus Christi 1983, pet. ref'd)(repeated commission of robberies on different dates were part of "same criminal episode" and were subject to joinder).

**27.** *See, e.g., United States v. Nocella,* 849 F.2d 33, 38 (1st Cir.1988); *United States v. Mapp,*

170 F.3d 328, 334 (2nd Cir.1999); *United States v. Arnold,* 106 F.3d 37, 40–42 (3rd Cir.1997); *United States v. Melgar,* 139 F.3d 1005, 1013–15 (4th Cir.1998); *United States v. Carpenter,* 963 F.2d 736, 740 (5th Cir.1992); *United States v. Doherty,* 126 F.3d 769, 776 (6th Cir.1997).

**28.** *See* 532 U.S. at 177–88, 121 S.Ct. 1335 (Breyer, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting) ("The majority's rule permits law enforcement officials to question those charged with a crime without first approaching counsel through the simple

decline the invitation for several reasons. First, appellant offers no compelling rationale to suggest that the Texas Constitution differs from the federal constitution on this particular issue, namely, whether interrelated offenses should be treated as the "same" offense for purposes of custodial interrogation. In fact, Texas has long used the same *Blockburger* test to analyze Fifth Amendment double jeopardy issues that the Supreme Court used to decide this case.[29] Moreover, we have consistently followed the Supreme Court in requiring *Miranda* warnings as a matter of state, as well as federal, constitutional law.[30] We have followed Supreme Court precedent in

the Sixth Amendment "critical stage" analysis and regarding questioning under the Sixth Amendment.[31] Appellant must do more than merely argue that the Supreme Court majority "got it wrong," the dissent "got it right," and therefore, Texas courts should follow the dissent rather than the Supreme Court majority on this constitutional issue.

 Appellant points to nothing unique in Texas history, law, or jurisprudence which would require, or even suggest a basis for, Texas courts to deviate from Supreme Court precedent on this issue.[32] Although the Texas Constitution

---

device of asking questions about any other related crime not actually charged in the indictment.... We can, and should define 'offense' in terms of the conduct that constitutes the crime that the offender committed on a particular occasion, including criminal acts that are 'closely related to' or 'inextricably intertwined with' the particular crime set forth in the charging instrument").

29. In *Ex parte McWilliams*, 634 S.W.2d 815 (Tex.Crim.App.1982), we expressly adopted the *Blockburger* standard and explicitly rejected the "one act or transaction" analysis of the carving doctrine in favor of *Blockburger's* "one offense" analysis and noted that "[t]he constitutional provisions speak of double jeopardy in terms of the 'same offense' rather than 'same transaction' ..." *Id.* at 823. In essence, appellant asks us to resuscitate the discarded carving doctrine, at least for purposes of custodial questioning. This we decline to do for the very reasons expressed in *McWilliams*:

> We now abandon the carving doctrine for the compelling reason that it encourages crime. When the carving doctrine may be applied to a situation in which a defendant robs, kidnaps, rapes, and murders his victim, the defendant suffers no more punishment than he would had he committed only one of the crimes. Justice and reason demand prosecution for each of the separate offenses so that a robber will be deterred from kidnapping, raping, and murdering the victim.

*Id.* at 822 (op. on reh'g).

30. *See, e.g., McCambridge v. State*, 778 S.W.2d 70, 76 (Tex.Crim.App.1989) (holding that Supreme Court Fifth Amendment "bright line" rules regarding right to counsel for custodial interrogations applies to Texas constitutional analysis as well); *Olson v. State*, 484 S.W.2d 756, 762, 772 (Tex.Crim.App.1969) (holding that the scope of the privilege against self-incrimination in Article I, § 10 of the Texas Constitution, is similar to that of the Fifth Amendment of the United States Constitution, overruling prior precedent that granted greater right against compelled self-incrimination than more recent Supreme Court decision, and stating, "we have found no historical evidence for appellant's position that the framers of our constitution meant, by choice of language, for Article I, § 10, to be more encompassing than, 'witness against himself' as used in the federal constitution").

31. *See Foster v. State*, 787 S.W.2d 385, 386 (Tex.Crim.App.1990) (right to counsel under both federal and Texas constitutions attaches to any "critical stage" once formal, adversarial judicial proceedings have commenced); *McCambridge*, 778 S.W.2d at 76.

32. Appellant, in a supplemental brief on remand from the United States Supreme Court discusses various provisions of the Fair Defense Act, enacted by the Texas Legislature in 2001. These provisions apply only to criminal cases commenced on or after January 1, 2002. Appellant's case was tried in 1997. Moreover, the provisions of this Act are based upon statute, not the Texas Constitution.

is an "available" tool to reject Supreme Court decisions with which we might disagree,[33] we are not free to impose our notions of fairness, nor those of dissenting Supreme Court justices, upon Texas citizens as a matter of state constitutional law without firm support in state history or policy. This Court's constitutional mandate is to uphold and faithfully interpret the laws of this state, and not to create new constitutional doctrines without solid jurisprudential foundation.[34] That is not to say, of course, that we cannot or will not construe our state constitution as providing rights which the federal constitution does not provide, but rather that we should do so only when unique aspects of Texas history, jurisprudence, or law support that separate interpretation.

Second, the Texas Legislature has provided significant statutory guidance regarding custodial questioning and established numerous procedural requirements concerning the taking of a suspect's statement.[35] The Legislature has not, however, indicated that otherwise lawful and proper custodial questioning of a suspect, without the presence or permission of his lawyer, is prohibited if that suspect has been charged for a related offense or one arising from the "same criminal episode."

Third, appellant's proposed constitutional rule is unwieldy and unworkable. As the Arizona Supreme Court has stated: "one of the few things worse than a single exclusionary rule is two different exclusionary rules."[36] In Texas, police officers must follow all federal constitutional guidelines when questioning a suspect. They must also adhere to Texas Code of Criminal Procedure article 38.22.[37] Appellant would have Texas law enforcement officers determine, before questioning a suspect and as a matter of state constitutional law, whether their investigation concerns an offense which might be related to or somehow part of the same "criminal episode" as another offense for which the suspect has been charged.

This is neither necessary nor practical, especially when a simpler solution already exists: the suspect can simply say, "No."[38]

---

Furthermore, appellant does not allege any violation of the Fair Defense Act. Finally, these arguments were not made at trial or on original submission, thus they will not be considered now.

33. *See* Paul M. Bator, *The State Courts and Federal Constitutional Litigation*, 22 Wm. & Mary L.Rev 605, 606 n. 1 (1981) ("I must confess to some misgivings about the extent to which some of this commentary [regarding independent state constitutional grounds] seems to assume that state constitutional law is simply 'available' to be manipulated to negate Supreme Court decisions which are deemed unsatisfactory").

34. As was noted in *Sharp v. Jester*, 239 S.W. 655, 658 (Tex.Civ.App.-Dallas 1922, no writ):
Courts are the agency by which law is made effective—merely the servants of the law, charged with the duty, not to make a law to their liking by forced construction either to give a remedy not provided for or to withhold one secured, but to ascertain and enforce the law as created by the legislative power of the state.

35. *See* Tex.Code Crim. Proc. art. 38.22.

36. *State v. Bolt*, 142 Ariz. 260, 268–69, 689 P.2d 519, 527–28 (1984) (en banc).

37. Article 38.22 governs when the State may use an accused's written statement.

38. Appellant, in his amended brief states:
The Supreme Court Majority simply failed to consider the accused's right to have counsel who must adequately investigate all potential criminal liabilities. The acceptance of the Supreme Court Majority holding would result in an unacceptable situation where an attorney has discovered other possible criminal liability tied to the charged offense, but he cannot do anything about it, other than allow his client to be

If a person has already been charged with an offense and has an attorney representing him on that charge, that attorney can tell his client not to talk to the police if questioned about *anything*.[39] It is then up to the accused to decide whether or not to follow his counsel's advice. If law enforcement officers subsequently approach the suspect about another offense, whether related to the charged offense or not, and administer *Miranda* warnings, neither the federal nor the Texas constitution prevents the suspect from voluntarily waiving his privilege and speaking to officers about his other offense, even without the benefit of his counsel's assistance.

Appellant apparently *never* invoked any Fifth Amendment right not to speak to law enforcement, not even in 1994 when officers first questioned him about the burglary. His appointed counsel on the burglary charge twice expressly permitted law enforcement officers to interview his client (without counsel's assistance) about the burglary charge, once while appellant was in custody and once while appellant was on bond and returned to Walker County for court appearances in September, 1995.[40] Only when appellant freely and voluntarily

confessed the murders to *his father* in Odessa and *his father* notified Walker County law enforcement was appellant rearrested and questioned further about the murders. Clearly, this is not an example of the indefatigable Inspector Javert stalking his prey through Paris sewers.[41] Instead, it appears to be an example of a man who developed a conscience and eventually wanted to get the murders "off his chest" by confessing to his conduct—first to his father, and then to law enforcement.[42] There is no sin or constitutional infirmity in this personal decision.

Thus, we hold that the taking of appellant's confession did not violate any constitutional provision and that the trial court did not err in admitting the written statement into evidence at appellant's trial. Accordingly, we overrule points of error one, two, and three.

## II.

In two other points of error, appellant claims that his written consent to search his apartment was illegally obtained because he consented to the search only after

---

continuously interrogated without his knowledge, on numerous potential crimes related to the offense for which he must defend the client.

Of course, if the client adamantly denies any additional criminal acts as a part of the same transaction or same criminal episode and his attorney believes him, it may be a very effective strategy for the attorney to advise his client to talk to law enforcement and be forthcoming with whatever information he has. Such cooperation may well result in a more favorable plea bargain on the charged offense.

39. For example, the attorney could instruct his client to give the officer the attorney's card and say nothing more. *See* discussion *supra* note 9. Alternatively, the client may ask to call his attorney before speaking with law enforcement officers. A person does not become "a potted plant," incapable of indepen-

dent decision-making, merely because he has an attorney to represent him on a related charge.

40. In September, 1995, a cooperative appellant accompanied officers out to the general location where the bodies had been buried, but nothing was found. When investigators asked appellant if he, appellant, were looking for the bodies, where would he look, appellant "pointed west across the highway in the general vicinity of where we eventually found the bodies."

41. *See* Victor Hugo, Les Misérables (1862).

42. When arraigned at the airport immediately upon his return to Walker County from Odessa, appellant told the magistrate that "he just couldn't live with this anymore."

his confession was illegally obtained.[43] Appellant argues that, if police officers had no right to speak to him at all after his arrest in Odessa because he was represented by counsel on the burglary charge in Walker County, then, *ipso facto*, they had no right to ask him to consent to a search of his apartment in Odessa. But we have found that the police in Odessa were not prohibited from speaking to appellant. Therefore, they were not prohibited from seeking his written consent to search his house. Therefore, his free and voluntary consent to search was valid.[44] It was not the "fruit of a poisoned tree." *See Wong Sun v. United States*, 371 U.S. 471, 484–486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We therefore overrule appellant's points of error four and five.

### III.

■ In points of error six, seven, and eight, appellant argues that the trial court improperly admitted five knives,[45] some of which fit the definition of a "prohibited weapon," [46] because: 1) appellant's father originally seized the knives and he acted without a search warrant; and 2) the knives were irrelevant to any disputed issue at the guilt stage.

Mr. Cobb testified at a pre-trial hearing that, on the night of appellant's arrest, appellant's girlfriend (who was in the hospital giving birth to a baby) asked him to retrieve some car keys from the couple's apartment. Mr. Cobb testified that he did so, but that in the process he also took five knives that he had found there and delivered them to police. After obtaining a search warrant for appellant's apartment, Odessa police officers found eighteen more knives which the State also introduced into evidence. The State argues that even if Mr. Cobb had not taken the first five knives from appellant's apartment, the police would have discovered and seized them when they conducted their own search of the apartment.

Appellant argues that Mr. Cobb's act of taking five knives from his son's apartment was an illegal search and seizure under the Fourth Amendment and corresponding Texas constitutional provisions. However, because there is no evidence that Mr. Cobb was acting under the control of, or at the behest of, law enforcement rather than as a plain citizen, Mr. Cobb's conduct does not implicate constitutional restraints against governmental searches and seizures. Under federal law, for a search to be illegal, the search must be the result of state action by state agents.[47] Neither the

---

**43.** Immediately after he gave his written confession to Odessa police officers, appellant signed a consent-to-search form for his apartment. Odessa officers took appellant to the apartment to look for a "double edge knife with a black widow on the handle" which appellant said he used to kill Mrs. Owings. Because he and his girlfriend had only recently moved into the apartment, the rooms were stacked with storage boxes and appellant was unable to find the murder weapon. He did, however, find and give the officers a ring, saying, "[t]his is the wedding band I took off of Margaret Owings when I killed her."

**44.** *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex.Crim.App.2000).

**45.** A total of 23 knives were taken from appellant's Odessa apartment. Eighteen of those were seized by Odessa police officers pursuant to their search warrant. Appellant's father gave police five more knives which he had independently taken from appellant's apartment after the police had taken appellant to the apartment to look for the murder weapon but before they executed their search warrant the next day.

**46.** *See* TEX. PENAL CODE § 46.05.

**47.** *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) ("a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdo-

Fourth Amendment nor the Texas Constitution requires trial courts to exclude incriminating evidence that was obtained by a private citizen's illegal search.[48] However, under Texas Code of Criminal Procedure article 38.23, if a private citizen seizes evidence in violation of any federal or state constitutional provision or law, that evidence is subject to exclusion.[49]

■ Thus, if the evidence showed that Mr. Cobb had committed the crime of theft when he took five knives from his son's apartment and gave them to police, then the trial court abused its discretion in admitting that evidence.[50] On this record, however, there is no evidence that supports the conclusion that Mr. Cobb committed theft. Here, as in *Stone v. State*,[51] the objects were taken from the defendant's residence by a person authorized to be on the premises. There is no evidence that the objects were taken for the purpose of depriving their owner of them but rather for the purposes of a criminal investigation.[52] In *Stone*, a babysitter, who had permission to enter the defendant's home to pick up supplies for the children that she cared for in her own home, found a stack of photographs on a table depicting the defendant engaging in sexual activities with his child. The babysitter took the pictures and turned them over to police officers and she identified the pictures' owners. This Court held that her action

> negates any inference that she sought to deprive the owner of his property. The effect of these actions would be to facilitate the return of the property if the police did not find them to be evidence of a crime. We hold that Art. 38.23 ... does not require the exclusion of this evidence.[53]

Similarly, we hold that the trial judge in this case did not abuse his discretion in finding that Mr. Cobb did not steal these five knives. Rather, his son's girlfriend asked him to go to the apartment to retrieve her car keys. Mr. Cobb did so, and finding some knives, Mr. Cobb took what he believed might be evidence of Mrs. Owings' murder to the police.

ing does not deprive the government of the right to use evidence that it has acquired lawfully"; evidence obtained by government agents in violation of the Fourth Amendment subject to suppression, but evidence illegally obtained through a search by a private citizen is not); *Nelson v. State*, 607 S.W.2d 554, 555 (Tex.Crim.App. [Panel Op.] 1980); *Gillett v. State*, 588 S.W.2d 361, 363 (Tex.Crim.App. 1979) (en banc).

48. *State v. Johnson*, 939 S.W.2d 586, 588 (Tex.Crim.App.1996).

49. *Id.* at 587–88 (evidence illegally taken by capital murder victim's sons from residence victim shared with defendant and turned over to police properly suppressed under art. 38.23).

50. The trial judge is the exclusive trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony at a hearing on a motion to suppress evidence. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.

Crim.App.1997). Furthermore, "trial courts have broad discretion in their evidentiary rulings and [they] ... are usually in the best position to make the call on whether certain evidence should be admitted or excluded." *Id.* Mixed questions of law and fact that turn on the credibility and demeanor of a witness are reviewed under the almost-total-deference standard, and mixed questions of law and fact that do not turn on the credibility and demeanor of a witness are reviewed de novo. *Id.* Also, we examine the evidence in the light most favorable to the trial court's ruling. *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim.App.1999).

51. 574 S.W.2d 85, 88–89 (Tex.Crim.App. 1978).

52. *Id.*

53. *Id.*

Second, appellant argues that the admission of these five knives was error because they were irrelevant at the guilt stage of the trial. He is correct. The State makes no argument concerning the relevancy of these five knives—none of which was asserted to be the murder weapon—to any disputed issue during the guilt stage.[54] Even if marginally relevant, the evidence should have been excluded at the guilt stage under Rule 403 as unfairly prejudicial when compared to its purported probative value. Nonetheless, we should not reverse a conviction for the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect."[55] In this case, we are confident that the admission of this evidence did not influence the jury. Here, appellant had confessed to murdering the mother and child; the evidence fully supported and corroborated his confession; he did not contest his guilt; closing arguments for both the defense and State at the guilt stage were less than seven pages long and neither side mentioned the knives. Appellant points to no disputed fact or issue at the guilt stage which the admission of this evidence might have influenced. We are unable to discern any harm under Rule 44.2(b).

Therefore, we overrule appellant's points of error six, seven, and eight.

## IV.

In his final point of error, appellant asks that we revisit our determination on original submission that the evidence was legally sufficient to support the jury's finding, under Special Issue Number One, that he would be a future danger to society. However, appellant points to nothing in this Court's original opinion on this issue that he contends is incorrect, faulty, or unfair. Under the circumstances, we decline to re-review what we have already reviewed and found legally sufficient. Therefore, we overrule appellant's ninth point of error.

Finding no reversible error, we affirm the jury's verdict and the trial court's judgment.

PRICE, JOHNSON and KEASLER, JJ., concurred in the judgment.

---

54. At the time that the knives were admitted, appellant's objection was that they should not be admitted until the punishment stage because they were not relevant until then. He was right.

55. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998); *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997).