

# IN THE
# TENTH COURT OF APPEALS

### No. 10-20-00074-CR

**JOE MARTINEZ,**

                                                 **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                 **Appellee**

---

### From the 54th District Court
### McLennan County, Texas
### Trial Court No. 2017-1416-C2

---

## MEMORANDUM OPINION

---

The grand jury indicted Joe Martinez for eight counts of indecency with a child younger than fourteen years of age by contact. The State amended the indictment on two occasions and the trial proceeded on eight counts of indecency with a child younger than seventeen years of age.

After a jury trial, the jury convicted Martinez on all eight counts of the indictment, assessed punishment on each count at confinement for twenty years, and imposed a fine

of $5,000 on each count. The trial court sentenced Martinez accordingly and ordered that the sentences in relation to counts II and III were to run consecutively; otherwise, the sentences were to run concurrently. We reverse and render in part and affirm in part.

Jane Doe (J.D.) is the individual named by the State as the person upon whom Martinez committed the offenses alleged in the indictment. Jane Doe is a pseudonym.

J.D. was born on August 8, 1989. She first met Martinez through a program called Young Marines. Young Marines is a disciplinary program as well as a program for young adults or children who want to join the military when they become adults. Martinez started the Greater Waco Young Marines program in Waco.

Disciplinary problems led J.D.'s older brother, Tony, to join the Young Marines. J.D. joined the Young Marines when she was in the fourth grade and around ten years old. J.D. joined, not because of disciplinary reasons, but because she wanted to do something with her brother.

Rebecca Martinez is J.D.'s mother. At some point, Rebecca met Martinez and later, on December 31, 2001, they were married. J.D. testified that Martinez made her uncomfortable even before her mother married him. He "excessively complement[ed] my body, my looks, my blond hair, hugging me differently than I had been hugged before, holding me differently, rubbing my back differently." J.D. told her mother that Martinez made her uncomfortable, but her mother became angry with her and told her that she was wrong, and that Martinez had done nothing wrong.

J.D. testified about an incident that took place about six months after Rebecca and Martinez married; J.D. was twelve years old and in the sixth grade at the time. Martinez began to scratch her back as he had done before. However, this time instead of scratching J.D.'s back on the outside of her t-shirt, as he had always done, he put his hand under her shirt. Martinez scratched back and forth from her bra line to the top of her basketball shorts; J.D. had just begun to wear a bra. As he scratched J.D.'s back, Martinez put his fingers under her bra strap and "went from side to side on my back and then he went to the side." J.D. further testified that "[w}here my side and my arm were meeting, it stopped his hand from fully going around." That incident is not one of the offenses charged in this case.

J.D. did not tell her mother about the incident. However, she did tell Tony. Tony suggested that J.D. talk to Rebecca; she did. Martinez was present at the time of the conversation. Martinez and Rebecca told J.D. that she was just hormonal and overreacting. Even after that conversation, Martinez continued to support J.D. in her activities and in her academics; he referred to as his favorite.

J.D. also testified that from the time that J.D. was twelve until she was fourteen, Martinez continued to touch her "as far as rubs, scratches, tickles on my back over my shirt or with my feet or my legs." However, J.D. said that Martinez did nothing "inappropriate" to her during that time.

According to J.D., things changed in the fall of her freshman year when J.D. was around fourteen. Martinez, as he had done many times before, began to rub J.D.'s feet and her legs up to her knee. This time, though, something different happened. Instead of stopping at J.D.'s knee, Martinez began to rub J.D.'s inner thigh and moved up her thigh and, "[as] he would rub my thigh, every so often he might drag his fingers from the front sides up my vagina and down and then go back to rubbing my leg." J.D. could not recall how many times that Martinez touched her vagina on this occasion, but she did remember that it was several times, more than one but not over five.

When asked how often Martinez touched her in this way, J.D. testified, "[n]ot often. Two to three times a year for two to three years." She clarified her answer: "I would say two years," around eight times.

The inappropriate touching stopped when J.D. started driving; she stayed away from Martinez. Also, J.D. began to put up barriers such as putting a pillow between her legs, wrapping herself tightly in a blanket, and other things. Also, Rebecca laid down several rules about what J.D. could do around Martinez including what clothing that she could wear, leg rubs, and positioning when Martinez gave J.D. driving instructions. Finally, J.D. moved out of the house when she was eighteen.

Madison VanMeter and J.D. were friends. Madison recalled that at some point, she, J.D. and J.D.'s sister, Brittany, had a conversation. As best we can tell from the record, this conversation took place before the State became involved. Madison began discussing

a personal matter that was pending in the District Attorney's office; she had made an outcry in which she asserted that she had been sexually abused by her stepfather. Madison's situation contained similar allegations to those of J.D. J.D. became very emotional and began to cry when Madison discussed her own situation.

During those conversations, J.D. telephoned her brother, Tony. After the phone calls with Tony, J.D. contacted the Advocacy Center. The staff at the Advocacy Center advised J.D. to confront Martinez in the hopes that he would admit to the abuse and apologize. They would take another approach if he did not admit to and apologize for the abuse.

J.D., Tony, Rebecca, Brittany, and Martinez met at Martinez' house. J.D. confronted Martinez. According to J.D., Martinez said, "If I knew the things that I had done bothered you for this long, then I would have apologized sooner." J.D. asked Martinez if he knew that he had a problem. Martinez shook his head "yes" as he began to cry. J.D. testified that she accepted the apology and had closure.

On November 30, 2009, when J.D. was twenty years old, she gave birth to a daughter. J.D. was afraid that Martinez might harm her daughter if he were around her; J.D. decided to talk about what Martinez had done to her. She talked to her daughter's father, Daniel Weiss, and Daniel's mother, Mary Weiss. Daniel and Mary both testified that J.D. never told them that Martinez touched her vagina, just that Martinez had touched her "inappropriately."

Later, J.D.'s sister, Brittany, gave birth to a daughter. Brittany and her daughter lived with Martinez and Rebecca. J.D. felt that her niece needed to be protected and she decided to contact the police.

Apparently, before she contacted the police, both the Texas Department of Family and Protective Services, Child Protection Services, and the Robinson Police Department became involved. The agencies became involved in April 2014. Jarvis Lewis handled the referral for CPS. Sergeant Michael Noel investigated the case for the Robinson Police Department.

Lewis testified that CPS received a referral based on an outcry that J.D. had made. J.D. testified that she did not contact CPS. Lewis's concern was for J.D.'s young niece who was living in Martinez's home. On April 11, 2014, Lewis interviewed Rebecca and Brittany and put a safety plan into effect out of concern for the safety of Brittany's daughter. Under the safety plan, Brittany and her daughter were to move in with her brother, Tony, and his wife.

Lewis interviewed Martinez the next day. After the interview, Martinez agreed to vacate the home so that Brittany and her young daughter could move back into the home.

Later, Lewis interviewed J.D. and after the interview, he forwarded the case to law enforcement.

Michael Noel, then a sergeant with the Robinson Police Department Criminal Investigation Division, received the referral in April 2014. Noel interviewed J.D., Tony,

Madison, Rebecca, Mary Weiss, and Martinez. Over Martinez's objection, Noel testified that he noticed no inconsistencies or "red flags" in the statements made by J.D., Tony, Weiss, or Madison when compared to other statements that they had made or when compared to each other's statements. To the contrary, Sergeant Noel felt that Rebecca was neither forthcoming nor honest. It was clear to Sergeant Noel that Rebecca had a negative opinion of J.D. Sergeant Noel also found inconsistencies in statements that Martinez gave to him and those that Martinez gave to CPS.

At the conclusion of his investigation, Sergeant Noel felt that he had enough probable cause to arrest Martinez for indecency with a child by touching J.D.'s vagina; the trial of this case ensued.

In his first issue on appeal, Martinez asserts that the evidence is insufficient to support "Counts 1 through 6 of the indictment, therefore this Court should vacate Counts 1 through 6." He contends that "[t]he State failed to prove the elements of indecency with a child because it did not admit evidence of any illegal conduct prior to the end of 2014."[1]

We take the essence of Martinez's argument to be based upon J.D.'s testimony that Martinez did nothing inappropriate to her between the back rubbing incident when she was twelve years old and the first time that he rubbed her vagina when she was about fourteen. Therefore, Martinez claims that because, according to J.D.'s testimony, there

---

[1] We believe that Martinez intended to refer to "the end of 2004" instead of 2014, because in the body of his argument he maintains that "any counts that allegedly occurred prior to the end of August 2004 must be vacated due to legally insufficient evidence."

are no events to tie to the "on or about" dates alleged in the first six counts of the indictment, the evidence is insufficient to support convictions on those counts.

The State counters that the "on or about" language in the indictment permits them to prove a date other than that alleged so long as the date is anterior to the indictment and within the statute of limitations applicable to the offense. Therefore, claims the State, the evidence is sufficient to support conviction on all eight counts of the indictment.

We note that Martinez's complaint is not one about notice, but, rather, is directed at the sufficiency of the evidence.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

In our review, we consider all evidence admitted at trial, including any evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Jackson*,

443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  When the record supports conflicting inferences, we presume that the factfinder resolved any conflicts in favor of the verdict and defer to that determination.  *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

We measure sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."  *Id*.

Absent circumstances not relevant here, it is not necessary for the State to allege a specific date in an indictment.  *Sledge v. State*, 953 S.W.2d 253, 255 (Tex. Crim. App. 1997).  The general proposition in cases that involve "on or about" dates in indictments is set forth by the court in *Sledge*: "It is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period."  *Id.* at 256 (citing *Thomas v. State*, 753 S.W.2d 688, 693 (Tex. Crim. App. 1988).  The *Sledge* court also quoted the following from *Thomas*: "[w]here an indictment alleges that *some relevant event transpired* 'on or about' a particular date, the accused is put on notice to prepare for proof that the event happened at any time within

the statutory period of limitations." *Sledge v. State*, 953 S.W.2d at 256 (quoting *Thomas v. State*, 753 S.W.2d at 693) (emphasis added).

In *Sledge*, the State charged Sledge, in a two-count indictment, with the offenses of aggravated sexual assault and indecency with a child. The State alleged that the offenses occurred "on or about" August 31, 1988. The State used the date of August 31, 1988, because that was the last time that the alleged victim and defendant had any contact. However, at trial, the State proved that the alleged misconduct occurred in 1986 and 1987. Against Sledge's claim that the evidence was insufficient due to the conflicting date in the indictment and the proof, the court held that the State could properly proceed on the earlier dates and that the evidence was sufficient to support the conviction. *Sledge v. State*, 953 S.W.2d 253 (Tex. Crim. App. 1997).

The court in *Sledge* disagreed with the appellant's claim that the evidence was insufficient. The court disagreed because "the dates of the *offenses proven*—1986 and 1987—are anterior to the presentation of the indictment . . . and are within the ten year limitation period." *Sledge v. State*, 953 S.W.2d at 256 (emphasis added).

The defendant in *Sanchez v. State*, 400 S.W.3d 595 (Tex. Crim. App. 2013) solicited sex online from an undercover agent who pretended to be "Molly," a fifteen-year-old girl. The solicitations began in a chat room in April 2004. The defendant repeatedly asked "Molly" if she would have sex with him. These conversations took place off and on for two years and focused on sex.

On January 24, 2006, "Molly" agreed to meet the defendant at her home and have sex. Rather than meet "Molly," the defendant met the undercover agent.

On appeal, the court set out the general rule that we have set out above. The court then wrote: "What that means in the instant case is that the State could have obtained a conviction for any solicitations by appellant to 'Molly' *that occurred* on or before the date in the indictment up to the statute of limitations cutoff date." *Sanchez v. State*, 400 S.W. 3d at 600 (emphasis added). The court continued, "no conduct the State attempted to prove occurred outside that time frame." *Id.*

The cases that we have discussed have a common denominator: the State proved that a relevant event or occurrence transpired that was tied to the "on or about" date. The case before us is different as to some of the counts in the indictment.

Because of the nature of the record in this case, in order to provide a framework from which we can determine the dates involved, it is necessary that we begin with the time when, according to J.D., Martinez placed his fingers under J.D.'s bra strap. The evidence shows that event occurred when J.D. was twelve years old and in the sixth grade. Based upon J.D.'s date of birth, the testimony that J.D. was twelve years old and in the sixth grade when Rebecca and Martinez were married in December 2001, and J.D.'s testimony that the event took place about six months after Rebecca and Martinez married, it appears that this event occurred in the summer 2002. As far as the record here reveals, that incident did not give rise to any criminal charges.

J.D. testified, without contradiction, that nothing inappropriate happened after the bra incident until the fall of her freshman year when she was "about" fourteen years old. It was then that Martinez began to touch J.D.'s vagina through her underwear. As J.D. testified, "leg rubs turned into inappropriate genital touching." He touched "me inappropriately on my vagina."

In the fall of 2004, J.D. was "about" fourteen (she was fifteen in August 2004) and was a freshman. Count VI of the indictment reflects that the date of the offense covered by Count VI is August 1, 2004. That corresponds to the time that J.D. says that the abuse happened—in the fall of her freshman year when she was "about" fourteen. J.D. testified that Martinez touched her vagina two or three times a year for two years after that. Count VII alleges a date of January 1, 2005. In Count VIII the State alleged a date of August 1, 2005. We have outlined the testimony as to specific events tied to those dates and those dates satisfy the general rule in that they are anterior to the presentation of the indictment and within any applicable limitations period.

Earlier in this opinion, we acknowledged the general rule that "on or about" language in an indictment allows proof that an event occurred anterior to the presentment of the indictment and within the appropriate period of limitations. Nevertheless, as we have noted, there must be *some relevant event* tied to that "on or about" language.

The "on or about" dates alleged in Counts I through V of the indictment are, respectively: January 1, 2002, August 1, 2002, January 1, 2003, August 1, 2003, and January 1, 2004. There is no evidence in this record to show that there is some relevant event tied to the allegations in Counts I through V of the indictment. In fact, J.D. testified to the contrary when she said that nothing inappropriate happened before the times alleged in Count VI in the indictment. Although J.D. testified that Martinez touched her inappropriately on her vagina, she said that did not begin until she was "about" fourteen, a freshman, and in the ninth grade. In effect, J.D. essentially and effectively denied the existence of the allegations in the first five counts of the indictment in this case.

Again, the State has relied on the general rule as to "on or about" language in indictments. We agree with the State as to the allegations contained in Counts VI, VII, and VIII. J.D. testified that after her freshman year, Martinez continued to touch her inappropriately on her vagina for a period of at least two years thereafter. The dates of the offenses proven in Counts VI, VII, and VIII are anterior to the presentment of the indictment and within any limitations period.

Martinez also contends that there is no evidence of any prohibited sexual contact. He argues that the witnesses all testified about "inappropriate" touching, not contact with J.D.'s breast, anus, or vagina. Dr. William Lee Carter, a psychologist, testified that a person might use different statements depending on who that person is talking to. "Inappropriate touching" can have a very broad meaning. Dr. Carter testified that the

question to ask is "is she talking about the same matter to all those different parties." We believe that J.D. explained what she meant by inappropriate touching. As J.D. testified, "leg rubs turned into inappropriate genital touching." She further testified that Martinez touched "me inappropriately on my vagina." J.D. was very explicit about what she meant by inappropriate touching.

We hold that the evidence is insufficient to support the convictions on Counts, I, II, III, IV, and V. We, therefore, sustain Martinez's first issue on appeal as it relates to those counts and enter a judgment of acquittal. We overrule Appellant's first issue on appeal as it relates to Counts VI, VII, and VIII and hold that the evidence is sufficient to support convictions on those counts.

In his second issue on appeal, Martinez asserts that the trial court abused its discretion when it allowed Sergeant Noel to testify, over objection, about any "red flags" or inconsistencies that he noticed during the interviews that he conducted in this case. Investigator Noel testified in detail about his training and ability in the field of deception detection. He noticed no "red flags" or inconsistencies in the things told him by those whom he interviewed except for Rebecca and Martinez.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *Walker v. State*, 406 S.W.3d 590, 593 (Tex. App.—Eastland 2013, pet. ref'd). A court abuses its discretion if its decision lies outside the zone of reasonable disagreement. *Cantu v. State*, 842 S.W.2d 667,

682 (Tex. Crim. App. 1992). We disregard nonconstitutional errors that do not affect substantial rights. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error has a substantial effect or influence on the jury's verdict. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). However, we will not reverse a conviction for the erroneous admission of evidence if, after we have reviewed the whole record, we have fair assurance that the error did not influence the jury, or had but a slight effect upon it. *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002).

Even if we were to hold that the trial court abused its discretion when it admitted Sergeant Noel's testimony, which we do not, we would not reverse on that ground. Except for Martinez, each of the people about whom Sergeant Noel spoke also testified before the jury. The jurors had the opportunity to hear and observe each of the witnesses as they testified. J.D.'s detailed account of the events remained consistent throughout the years. Although J.D. often used the term "inappropriately touched" in her various outcries, at trial she explained that term as "inappropriate genital touching" and "inappropriately touched my vagina."

Insofar as Martinez is concerned, the jury saw and heard a recording of Sergeant Noel's interview with Martinez; the jury could draw its own conclusions as to Martinez's credibility.

Because the jurors heard and saw the witnesses testify in open court, and because the jurors saw Martinez's interview with Sergeant Noel, those jurors could form their

own judgment as to the credibility of the witnesses and the weight to be given to their testimony.

We hold that even if the trial court erred when it allowed Sergeant Noel's testimony, as Martinez claims, we are convinced that the error did not have a substantial effect or influence upon the jury's verdict. We overrule Martinez's second issue on appeal.

The jury charge is the subject of Martinez's third issue on appeal. In its charge to the jury, the trial court instructed the jury that: "'Pseudonym' means a set of initials or a fictitious name chosen by a victim to designate the victim in all public files and records concerning the offense, including police summary reports, press releases, and records of judicial proceedings."

In the application paragraph relative to each of the eight counts in the indictment the trial court asked, in part, whether Martinez "engage[d] in sexual contact with Jane Doe, a pseudonym, by touching the genitals of Jane Doe, a pseudonym. . ." Martinez argues that such language is tantamount to the trial court's repeatedly referring to J.D. as a victim when that was a contested issue in the case.

When this case went to trial, article 57.01 of the Texas Code of Criminal Procedure defined "pseudonym" as meaning "a set of initials or a fictitious name chosen by a victim to designate the victim in all public files and records concerning the offense, including police summary reports, press releases, and records of judicial proceedings." TEX. CODE

CRIM. PROC. 57.01(2); repealed by Acts 2019, 86th Leg., ch. 469 (H.B. 4173) §3.01(2), eff. Jan. 2, 2021. The trial court's instruction tracked that statutory provision.

In *Martinez*, the Texas Court of Criminal Appeals wrote: "Following the law as it is set out by the Texas Legislature will not be deemed error on the part of a trial judge." *Martinez v. State*, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996) (citing *Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994) (a jury charge that tracks the language of a particular statute is a proper charge on the statutory issue).

Martinez relies on *Talkington v. State*, 682 S.W.2d 674, 675 (Tex. App.—Eastland 1984, pet. ref'd). In *Talkington*, the issue was whether the sexual encounter, which admittedly occurred, was consensual. Nevertheless, in its jury charge, the trial court referred to the complainant several times as the "victim." There was no issue as to the use of the term "pseudonym" in *Talkington* because that term was not used in the jury charge in that case.

Because the trial court followed the law as set out by the legislature, it did not err. We overrule Martinez's third issue on appeal.

In his fourth issue on appeal, Martinez complains that statutory provisions regarding the admissibility of unadjudicated offenses during the punishment phase of a criminal case are unconstitutional.

During the punishment phase of the trial, the trial court admitted evidence of an unadjudicated offense as related in an outcry made by Brittany's two-and one-half year-

old daughter. She had made an outcry wherein she said that her Poppop tickled her on her "hiney." "Hiney" was the word that she used to describe her vagina; "Poppop" is Joe Martinez.

The Texas Code of Criminal Procedure Art. 37.07(3)(a) provides that, at the punishment stage of trial:

> …[e]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant,…and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act…

TEX. CODE CRIM. P. ART. 37.07(3)(a)(1) (West 2019).

Martinez urges us to hold that article 37.07 of the Texas Code of Criminal Procedure is unconstitutional in that it violates his right to due process. Martinez lays out three reasons for his claim that the statute is unconstitutional and deprives either him or defendants in general of due process rights: (1) it deprives defendants of their constitutional right to an indictment; (2) defendants are not afforded the same evidentiary rights at the punishment phase that they are afforded at the trial on guilt/innocence; and, (3) the standard for determining guilt of unadjudicated offenses is relaxed during the punishment phase.

Article 37.071 of the Texas Code of Criminal Procedure, applicable to capital cases, contains similar unadjudicated offense provisions as those found in article 37.07. TEX. CODE CRIM. P. ART. 37.071(2)(a)(1) (West 2019).

The appellant in *Banda*, a capital case, claimed that the "introduction of unadjudicated extraneous offenses at the punishment phase, violates his rights to due process, equal protection, and a reliable sentencing process." The court noted that it had "repeatedly held that unadjudicated offenses may be introduced during capital sentencing." *Banda v. State*, 890 S.W.2d 42, 62 (Tex. Crim. App. 1994). In view of the court's holding in *Banda*, we are not inclined to hold otherwise as to article 37.07. (*See also Parker v. State*, 51 S.W.3d 719 (Tex. App. —Texarkana 2001, no pet.) ("Furthermore, Article 37.07, as enacted by the Legislature, allows each individual sentencing court to dictate what evidence may be presented at the punishment phase of a trial. Any matter the court deems relevant to sentencing is admissible." *Id*. at 726). We overrule Martinez's fourth issue on appeal.

We enter a judgment of acquittal as to Count I, Count II, Count III, Count IV, and Count V of the indictment. Otherwise, we affirm the judgment of the trial court.


JIM R. WRIGHT
Senior Chief Justice

Before Chief Justice Gray,
     Justice Smith, and
     Justice Wright[2]
Reversed and rendered in part and affirmed in part
Opinion delivered and filed April 27, 2022
Do not publish
[CR25]



---

[2] The Honorable Jim R. Wright, Senior Chief Justice (Retired) of the Eleventh Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court.  *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.