**Opinion filed July 17, 2012 Withdrawn; Affirmed and Substitute Memorandum Opinion filed August 7, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00041-CR

**DONNIE RAY PEARSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 185th District Court
Harris County, Texas
Trial Court Cause No. 1286988**

## SUBSTITUTE MEMORANDUM OPINION

We withdraw our opinion dated July 17, 2011, and issue the following substitute opinion. Appellant, Donnie Ray Pearson, was convicted of aggravated sexual assault of a child under the age of six and sentenced to life in prison without parole. In this appeal, appellant contends the evidence is legally insufficient to establish that (1) the complainant was sexually assaulted, and (2) appellant sexually assaulted the complainant. Appellant also complains that the trial court erred by permitting the State to impeach him with a felony driving while intoxicated (DWI) conviction. We affirm.

BACKGROUND

Ashley, the mother of the complainant, Linda, met appellant when she was in the sixth grade, and they dated in the tenth grade.[1] Ashley became pregnant, and she and appellant broke up before their daughter, Donna, was born. Ashley had three more daughters—Tonya, Rebecca, and Linda—each by a different father.[2] Ashley married Lawrence, Rebecca's father, in June 2004, and was still married to him at the time of trial. Appellant had married Misty and they had three sons.[3] Appellant and Ashley started to see each other at the same time Ashley was seeing another man, Cody. Ashley testified that Linda was "conceived close in time or actually at the time [Ashley was] actually with [Cody]." Linda was born in July 2007. Ashley told appellant that Cody was Linda's father. Ashley testified that she "had many conversations with [appellant] about this," but that appellant did not like the fact that Ashley had a child by someone else while he was trying to reconcile with her.

Appellant, who had separated from his wife, got back together with Ashley and moved in with Ashley and her four daughters in December 2008. After appellant moved in, the "conflict about Cody" did not "go away totally." According to Ashley, there were many occasions on which appellant wanted to discuss whether he was Linda's father, but Ashley responded each time that Cody was probably Linda's father. A paternity test ultimately established that Cody is Linda's father.

Before appellant moved in with Ashley and the girls, Ashley had never noticed anything odd about Linda's behavior or that she engaged in any "self-harming" behavior. In February or March 2009, Ashley noticed Linda's behavior changing. Linda, then nineteen months old, started pulling her hair out, leaving bald spots. Linda, who slept in

---

[1] To protect the identities of the complainant and the other minors in this case, we use pseudonyms for the complainant and the other minors and for the complainant's mother.

[2] At the time of trial, Donna was age 13, Tonya was age 12, and Rebecca was age 8.

[3] At the time of trial, appellant's sons, Henry, Bob, and Fred, were age 8, age 6, and age 3, respectively.

a crib, woke up on three different occasions with a busted lip and a scrape on her head on another occasion. With regard to her injuries, appellant suggested that Linda "was doing it to herself." Ashley also testified that, in February or March of 2009, Linda became scared of appellant and would cry and not want appellant to come near her. Ashley and appellant shaved Linda's head after Easter 2009, so that she would not have "anything to pull."

On April 29, 2009, Ashley talked to Heather Hartstock, a nurse at a medical clinic. Hartstock had first met Linda in September 2007, when Linda was two months old. Ashley told Hartstock that Linda had been pulling out her hair and that she had shaved Linda's head because she did not know what else to do. Ashley also reported that Linda was biting herself, banging her head, having a lot of outbursts, and was crying. Hartstock wanted Ashley to bring Linda to the clinic so that the doctor could refer her to a specialist in behavioral pediatrics. On May 6, 2009, Ashley brought Linda to the clinic for a fever. Ashley and Hartstock discussed the behavioral issues. On June 9, 2009, Ashley called Hartstock and told her that Linda had woken up with a busted lip and a bruise under her eye and was afraid to go to sleep. Hartstock talked to Ashley about putting Linda in bed with her or her sisters so that someone could watch her while she was sleeping. Hartstock also told Ashley to take Linda to Texas Children's Hospital (TCH) that day to be evaluated.

On June 9, 2009, Ashley took Linda to TCH to find out why she was injuring herself. However, the doctor at TCH "saw her for maybe five minutes, said she was just a bad kid and . . . had behavioral problems." On June 10, 2009, Hartstock reported the situation to CPS because she did not know what was going on. Hartstock asked Ashley if she had any concerns about the babysitter or her boyfriend injuring Linda. Ashley responded that she had no concerns.

Ashley testified that when Linda slept with her, she did not wake up with any injuries, but appellant "hated" having Linda sleep in their bed. Linda did not wake up

with any injuries when she slept with Donna and Tonya. Hartstock also suggested putting a video camera in Linda's room, but appellant was against the idea and said they could not afford it.

In late May or early June, appellant's three sons came to live with appellant, Ashley, and the girls. When the boys moved in, Linda started sleeping in a toddler bed, and Fred, appellant's 16-month-old son, slept in the crib in Linda's room.

When Ashley put Linda to bed on the night of July 6, 2009, Linda did not have any injuries to her face, head, or body. Ashley left the house for work no later than 7:00 a.m. the next morning.[4] Ashley did not see Linda before she left for work because Linda would not want Ashley to leave. Before she left, Ashley heard appellant put Fred in their bed with him. When Ashley left for work, appellant, Linda, Henry, Fred, Bob, and Tonya were in the house. Donna, who had stayed the night with her friend Elizabeth, was not home when Ashley left, and Rebecca was not there because she was staying with her father. Because of the expense of hiring babysitters, appellant quit his job to stay home with the children.

Elizabeth's parents dropped Donna and Elizabeth off after Ashley had left. Appellant went back to bed after letting Donna and Elizabeth in the house. Donna and Elizabeth went to sleep in Donna's room. Around 11:30 a.m. or 12:00 noon, everyone in the house was awake except Linda. It was unusual for Linda not to be awake by that time. After getting Linda up, Tonya noticed a bump on Linda's head and showed it to appellant. When Tonya changed Linda's diaper, she noticed there was blood on it, told appellant, and gave him the diaper. Appellant told Donna and Tonya to bathe Linda, but Linda, who normally liked baths, cried when they put her in the water. Tonya put a fresh diaper on Linda and watched her the rest of day.

At noon, Ashley received a text message from appellant stating that Linda had a knot on her head. Ashley called appellant immediately. Appellant said that Fred had hit

<hr />

[4] Ashley was working as a desk assistant for a doctor in the Medical Center.

Linda in the head with a toy. Ashley asked appellant why he was not watching the children. Appellant sent Ashley a text "a little while later saying that it was a little worse, just talking about that bruise." Ashley called appellant, but he did not say anything about the blood in the diaper. When Ashley called appellant on her way home from work, he told her that there was blood in Linda's diaper. When Ashley got home a little after 5:30 p.m., she saw that Linda's head was "lopsided." There was a "[b]ig bruise" on it. Appellant did not speak to Ashley, and Ashley dressed Linda, grabbed the diaper bag, and walked out the door. Ashley remembered that appellant said that he had saved the diaper and asked him for it. Appellant pulled the diaper out of the trash can. Appellant suggested to Donna that "someone could have snuck in at night." Appellant also told Donna that "he didn't want to get blamed for what happened."

Ashley took Linda to Bayshore Hospital, where she was told that injuries were the result of sexual assault. Michael Anderson, an officer with the Deer Park Police Department, went to the hospital to investigate the possible sexual assault of a child. Anderson testified that Linda "was seriously bruised all over her head to point where it didn't look like she had a normal round skull. It was red and purple, discolorations all over. There was bruising and marking on her extremities as well to the point that you knew something significant had taken place." Linda was transported to TCH for a sexual assault examination.

Tammy Herrera-Aguilera, a registered nurse and sexual assault nurse examiner at TCH, testified that Linda had extensive bruising on her head and entire body, including "oval or almost fingertip-type of bruises" on her forearms. Linda also had a torn frenulum—the tissue that attaches the lip to the upper gum. As to Linda's genital area, there were no injuries noted on the labia majora folds such as bleeding, tears, or abrasions, but dried blood was noted as to the inner folds. There was a tear through the posterior fourchette extending through the vestibule tissue along the fossa all the way to the edge of the hymen; the tear was three centimeters, which is a "big tear" on a child

5

Linda's size. There also was a complete tear through the hymenal tissue, with bleeding, bruising to the hymen, and a tear to the anus.

On July 8, 2009, Detective Ian Sawtell of the Deer Park Police Department took appellant into custody when he was stopped for a traffic violation. Appellant agreed to talk to Sawtell, "ma[king] mention that he figured [Sawtell] wanted to talk to him about [Linda]." Appellant made a recorded statement and, when asked, let the police take the clothes he was wearing when he was picked up. The police also took a saliva sample from appellant. Ashley gave Sawtell Linda's pink hoodie that was stained with what appeared to be chocolate and a pair of black shorts that belonged to appellant.

Christy Smejkal, a DNA analyst at the Harris County Institute of Forensic Sciences, testified that no sperm or other person's DNA was found on Linda's body or diapers. The pink hoodie contained stains that were Linda's blood, and a presumptive test for semen was positive. A mixture of Linda's and appellant's DNA was found on the hoodie. After performing another test on the pink hoodie, Smejkal confirmed that the stain was semen, but there was not enough DNA to get a profile. A blood stain on appellant's black shorts, three inches from the crotch, tested positive for Linda's DNA. Linda's blood was found on the back side of the jeans appellant was wearing when he was arrested. There were also three blood stains on the boxer shorts appellant was wearing when he was arrested; the blood stain in the crotch area was consistent with Linda's DNA, and appellant could not be excluded.

Appellant testified that the first day he watched the children, July 6, 2009, Fred hit Linda in the head with a toy, and Linda choked on a penny. He put ice on Linda's head; there was an indentation, but no knot on her head. Appellant stated that he texted Ashley, but she did not want the ice on her head. He let Linda run around, and her head was not swollen at the end of the day.

Appellant testified that he retrieved the penny from Linda's throat with his finger. Appellant said that there "was a mixture of a little bit of mucus and blood all over [his]

6

finger." Appellant explained that he "might have put [the penny] in [his] pocket." He did not tell Ashley or Sawtell about the incident with the penny.

Appellant testified he did not wake up that night or hear anything out of the ordinary that night. He heard Fred crying before Ashley left for work and he brought Fred to their bedroom and went back to sleep with Fred in their bed. Appellant stated that he did not have a problem with Linda sleeping in their bed, but he had a problem with her sleeping with them every night because it interfered with his sexual relationship with Ashley.

Appellant testified that Tonya showed him the knot on Linda's head, which got bigger as the day went on. He called and texted Ashley about the knot on Linda's head.[5] Shortly after showing appellant the first knot, the girls showed him a second knot on Linda's head. Tonya showed appellant the blood on the diaper, which he did not throw away, but, instead saved for Ashley. He suggested that the girls give her a warm bath. When appellant could not reach Ashley immediately, he called his mother about the blood in the diaper. He testified that he had not heard of Cody until December 2008. Appellant wondered if Linda was his daughter, but Ashley told him that he was not the father. Appellant testified that his semen could be on the hoodie because he used it to wipe himself after having sex with Ashley.

Both the State and appellant presented testimony regarding whether Linda or another person could have caused her injuries. Herrera-Aguilera testified Linda's injuries were "very extensive injuries for a child her age. These [were] very painful injuries." Moreover, "whatever caused these injuries was even more painful." In her opinion, Herrera-Aguilera did not believe that Linda caused these injuries. Herrera-Aguilera further testified the injuries were not consistent with a straddle injury, where the child falls and strikes something, because there was no bruising or swelling injury to the

---

[5] In his recorded statement to the police, appellant said it looked like the side of Linda's head had been hit with a baseball bat.

outside labia majora folds. Moreover, straddle injuries are usually one-sided, with bruises on just the left side or right side, and, here, there was bruising on both the left and right sides. Herrera-Aguilera stated it was possible that an adult male penis or another item caused the injuries. Herrera-Aguilera also stated "[a]ny showering or washing can rid the body of evidence."

Marcella Donaruma, a pediatrician at TCH, testified that Linda's injuries were not caused by an accident and it was not possible for Linda to have caused her own injuries. Moreover, a six-year old child would not have the strength to cause the anal or genital injuries; instead, it would take someone with "adult size and strength" to cause Linda's injuries. In Donaruma's medical opinion, the injuries were caused by blunt force penetrating trauma to the vagina, breaching the hymen and the anus. Donaruma explained that "[h]ymenal tear means that unequivocally something was inside of her vagina." Donaruma opined that Linda's injuries were the result of sexual abuse because of the nature of the trauma sustained to the vaginal and anal areas and the absence of any history or explanation for the injuries.

With respect to Linda's torn frenulum, Herrera-Aguilera explained that "[t]he torn frenulum is normally consistent with either a strike on the mouth or someone holding a hand or something over the mouth and the person struggling against that can cause a frenulum tear." Donaruma testified that a frenulum can be torn by the forceful introduction of an object into the mouth, hitting a flat surface, or "forcible pressure over the mouth that's being resisted."

Larry Parker, an obstetrician/gynecologist, testified as appellant's expert. Parker testified that a physician cannot make a diagnosis of sexual abuse because sexual abuse is not a medical diagnosis, but is a legal opinion. Parker explained that Linda's injuries should have been "investigated for potential of sexual assault," but he would not have diagnosed the situation as sexual assault because he would not have had enough information to make that determination. Parker testified that indirect blunt trauma can

mimic sexual abuse, he could not tell from looking at the injuries whether they were intentional or accidental, and a four or six-year-old child could have caused Linda's injuries.

The jury found appellant guilty of aggravated sexual assault of a child under the age of six and assessed a sentence of imprisonment for life without parole. This appeal followed.

## ANALYSIS

### Sufficiency of the Evidence

In his first issue, appellant claims the evidence is insufficient to establish that Linda was sexually assaulted.

We review the sufficiency of the evidence in this case under the *Jackson v. Virginia*, 443 U.S. 307 (1979), legal sufficiency standard. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see also Jackson*, 443 U.S. at 319. The jury is the exclusive judge of the credibility of witnesses and the weight to be given the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Further, we defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence. *Id.* We draw all reasonable inferences from the evidence in favor of the verdict. *Id.* This standard applies to both circumstantial and direct evidence. *Id.*

As alleged in the indictment, to sustain a conviction for aggravated sexual assault, the evidence must demonstrate that appellant intentionally or knowingly caused (1) "the penetration of the anus or sexual organ of a child by any means," TEX. PEN. CODE ANN. §

9

22.021(a)(1)(B)(i) (West Supp. 2011), or (2) "the sexual organ of the child to contact . . . the sexual organ of" appellant. *Id.* § 22.021(a)(1)(B)(iii).[6]

A sexual-assault victim need not testify as to penetration. *Villalon v. State*, 791 S.W.2d 130, 133 (Tex. Crim. App. 1990); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.—Houston [14th Dist] 2000, pet. ref'd). The state may prove penetration by circumstantial evidence. *Villalon*, 791 S.W.2d at 133; *Beckham*, 29 S.W.3d at 151. Evidence of the slightest penetration is sufficient to uphold a conviction, so long as it has been shown beyond a reasonable doubt. *Luna v. State*, 515 S.W.2d 271, 273 (Tex. Crim. App. 1974); *Campbell v. State*, 189 S.W.3d 822, 827 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Appellant contends that the State did not prove beyond a reasonable doubt that either he caused the penetration of Linda's vagina with an object or that the vagina made contact with his penis. Appellant states that while Linda had a spot of blood on her diaper and torn tissue on her hymen and anus, neither she nor any other eyewitness testified that she was sexually assaulted. Moreover, appellant asserts that Donaruma merely "speculated" that the bloody diaper and torn tissue were the result of sexual abuse because of the nature of the trauma and the absence of an explanation. Parker, appellant's expert witness, testified that there were too many unanswered questions; the injuries could have been caused by indirect blunt trauma; no one could determine whether they were intentional or accidental; and a four-year-old child could have caused them. Appellant further asserts that the presence of appellant's DNA on Linda's hoodie that had not been worn recently did not establish that Linda's vagina was penetrated or made contact with his penis.

Herrera-Aguilera testified that Linda could not have caused these extensive injuries to herself; the injuries were not caused by an accident; and an adult male penis or

---

[6] Aggravated sexual assault is a first degree felony. TEX. PEN. CODE ANN. § 22.021(e). The minimum term of imprisonment is enhanced to twenty-five years if it shown that the child was less than six years of age at the time the offense was committed. *Id.* § 22.021(f)(1).

other item caused the injuries. Donaruma testified that the injuries to Linda's anal and vagina areas were not caused by an accident or by Linda. Donaruma also opined that a six-year-old child could not have caused the injuries, but rather, it would require someone with "adult size and strength." Parker opined that indirect blunt trauma can mimic sexual abuse, and a four-year-old child could cause the injuries. Parker also explained that sexual abuse is not a medical diagnosis, but a legal opinion.

The jury could have found Herrera-Aguilera's and Donaruma's testimony more credible than Parker's testimony. *See Isassi*, 330 S.W.3d at 638. While appellant complains that Linda did not testify that she was sexually assaulted, such testimony was not necessary. *See Villalon*, 791 S.W.2d at 133; *Beckham*, 29 S.W.3d at 151. Herrera-Aguilera and Donaruma testified about Linda's extensive injuries to the genital area, with Donaruma explaining that "[h]ymenal tear means that unequivocally something was in [Linda's] vagina." Viewing all the evidence in the light most favorable to verdict, we conclude that a rational jury could have found that Linda was sexually assaulted. *See Beckham*, 29 S.W.3d at 152 (holding evidence was sufficient to prove penetration, even though the complainant did not testify, where two pediatricians who examined the complainant testified that her physical condition was consistent with penetration of her female sexual organ). We overrule appellant's first issue.

In his second issue, appellant claims that the evidence is insufficient to establish that he caused such penetration or contact. Specifically, appellant relies on the lack of testimony by Linda or any other eyewitness that he sexually assaulted her. Moreover, neither appellant's DNA nor his semen was found on Linda or her diapers. Appellant claims that the presence of his DNA on Linda's hoodie and her blood on his clothes did not establish that he penetrated her vagina or contacted it with his penis. Appellant also argues that other children ages four and older lived in the house and had access to Linda during the relevant time period and could have caused her injuries.

11

The evidence showed that appellant did not like the fact that another man had fathered Linda while appellant was also seeing Ashley. After appellant moved into the house where Linda lived, Linda started engaging in "self-harming" behavior, woke up with unexplained injuries, was afraid to go to bed at night, and was afraid of appellant. Linda eventually returned to being a happy, normal child after appellant no longer lived with her. Appellant did not like for Linda to sleep in his and Ashley's bed. When Linda slept with Ashley or her sisters, she did not wake up with any injuries. Appellant rejected the idea of putting a video camera in Linda's room.

When Ashley put Linda to bed on July 6, Linda had no injuries. Appellant was the only adult in the house on July 7, 2009, after Ashley left for work. While Parker testified that a four-year old child could have caused Linda's injuries, Donaruma testified that a six-year-old child could not, but that only someone using adult force could have caused the injuries.

With respect to the lack of appellant's DNA on Linda, appellant told Donna and Tonya to bathe her. Herrera-Aguilera testified that bathing could cause some of the evidence to wash away. However, there was semen on Linda's hoodie and appellant's DNA was on Linda's hoodie. Appellant testified that semen could be on the hoodie because he used it to wipe himself off after "having sex with Ashley." A blood stain on appellant's shorts, three inches from the crotch, tested positive for Linda's DNA. A blood stain in the crotch area of the boxer shorts appellant was wearing when he was arrested was consistent with Linda's DNA, and appellant could not be excluded. Linda's blood was found on appellant's jeans. Appellant explained that Linda's blood came to be on the jeans because of the penny he claimed to have pulled out of Linda's throat. However, appellant never told Ashley or the police that Linda had choked on a penny.

Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that appellant sexually assaulted Linda. We overrule appellant's second issue.

12

## Impeachment with Prior Felony Conviction

In his third issue, appellant claims that the trial court erred by allowing the State to impeach him with a conviction for a felony DWI with a child passenger. Specifically, appellant contends that the DWI conviction was not admissible pursuant to Rule 609(a) of the Texas Rules of Evidence because its probative value did not outweigh its prejudicial effect. *See* TEX. R. EVID. 609(a).

The State cross-examined appellant about a conviction for the assault of his wife, Misty, in November 2008, for which he went to jail. When the State questioned appellant about whether that was his "first stint in jail," appellant responded that it was not. Appellant's counsel then asked to approach the bench. The following took place at the bench regarding the DWI conviction:

> [Appellant's Counsel] MR. DAVIS: It's improper 404(b), there's no relevance to this, to that sort of conviction. There is no relevance to this case. It doesn't go to show motive, preparation.
>
> THE COURT: Isn't that why it makes it more admissible, though? That it's not a credibility issue.
>
> MR. DAVIS: It's not a credibility issue.
>
> THE COURT: I mean, his credibility is in issue.
>
> MR. DAVIS: His credibility would be in issue but it's an improper conviction for a credibility issue.
>
> [Prosecutor] MS. FALK: Under 609, it's a proper conviction for impeachment purposes to attack the witness' credibility once he takes the stand. It's not a 404, like, motive or identity thing. It's a —
>
> THE COURT: 609 credibility.
>
> MS. FALK: Yes.
>
> THE COURT: It's a conviction, right?
>
> MS. FALK: It was a probation that was revoked and he was sentenced to 6 months state jail. So, it's a pure, true conviction.

13

THE COURT:  So, it's not a 404 issue.

MR. DAVIS:  404(b).  Well, my objection is 404(b), it's improper 404(b).

THE COURT:  Your objection's overruled.

Appellant's counsel clearly objected to the State's examination of appellant on the DWI conviction on the basis that it was not relevant pursuant to Texas Rule of Evidence 404(b).  *See* TEX. R. EVID. 404(b).  To preserve a complaint for appellate review, the record must show that a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint.  TEX. R. APP. P. 33.1; *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009).  The complaint raised on appeal must comport with the objection made at trial.  *Clark v. State*, 356 S.W.3d 333, 339 (Tex. Crim. App. 2012).  If it does not, the complaint is not preserved for appeal.  *See Lovill*, 319 S.W.3d at 691–92 ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").  Because appellant's Rule 609 complaint does not comport with his Rule 404 relevance objection at trial, he has waived this issue on appeal.

However, even if appellant had not waived this issue, we conclude that the trial court did not abuse its discretion by allowing the State to impeach appellant with the DWI conviction.  We review a trial court's evidentiary rulings under an abuse-of-discretion standard.  *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Waters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).  We will not reverse the trial court's ruling if it was within the zone of reasonable disagreement.  *Tillman*, 354 S.W.3d at 435; *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006).

Once a defendant testifies, he places his credibility at issue and may thereafter be impeached like any other witness.  *Bowley v. State*, 310 S.W.3d 431, 434–35 (Tex. Crim. App. 2010); *Alexander v. State*, 740 S.W.2d 749, 763 (Tex. Crim. App. 1987).  Pursuant

14

to Rule 609, evidence that a witness has been convicted of a crime is admissible to attack the witness's credibility if the crime was a felony or involved moral turpitude and the court determines that the probative value of the evidence outweighs its prejudicial effect. TEX. R. EVID. 609(a). In determining whether the probative value of the evidence outweighs the prejudicial effect, courts apply the following factors: (1) the impeachment value of the crime; (2) the temporal proximity of the past crime relative to the charged offense and the witness's subsequent history; (3) the similarity between the past crime and the offense being prosecuted; (4) the importance of the defendant's testimony; and (5) the importance of the credibility issue. *Theus v. State*, 845 S.W.2d 874, 880 (Tex. Crim. App. 1992). Having considered the *Theus* factors, we conclude that the trial court's decision to admit evidence of the prior DWI conviction was within the zone of reasonable disagreement.

Even if the trial court erred by allowing the State to impeach the defendant with the prior DWI conviction, such error does not require reversal. Trial court error regarding the admission of evidence is generally non-constitutional error. *Solomon v. State*, 49 S.W.3d 356, 364–65 (Tex. Crim. App. 2001). Under Rule 44.2(b) of the Texas Rules of Appellate Procedure, non-constitutional error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Haley v. State*, 173 S.W. 510, 518 (Tex. Crim. App. 2005). A criminal conviction should not be overturned for non-constitutional error if the appellate court, upon examining the record a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002). In determining the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the

15

alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Id.* Whether the State emphasized the error can be a factor. *Id.*

Considering the entire record, we conclude that the error, if any, did not affect appellant's substantial rights. The State's questioning of appellant about the prior DWI conviction comprised less than two full pages of the reporter's record, which contained nine volumes of testimony. Moreover, the State did not emphasize the error because it never mentioned the DWI conviction during closing argument.

We conclude that even if the complaint appellant asserts on appeal had been preserved for appellate review, and even if the trial court erred in allowing the State to impeach appellant with the felony DWI, the error was harmless. We overrule appellant's third issue.

Having overruled all of appellant's issues, we affirm the trial court's judgment.


/s/     Sharon McCally
          Justice


Panel consists of Justices Frost, McCally, and Mirabal.[7]
Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[7] Senior Justice Margaret Garner Mirabal sitting by assignment.

16